WILLIAM D. TOWNSEND v. COMMON COUNCIL OF THE CITY OF SAUK CENTRE and Others.[1]

January 31, 1898.

Nos. 10,981—(297).

Municipal Corporation — Removal of Mayor — Cause—What Constitutes Misconduct in Office.

> The city charter authorized the common council to remove the mayor "for cause." He repeatedly and continuously refused to sign an order for the payment of money for a certain purpose. On the evidence, *held*, the council were not warranted in finding that he acted in bad faith, or that he wilfully or perversely disregarded his duty, or that he was generally incompetent to perform his duties to such an extent as to warrant his removal; and the orders convicting and removing him are reversed and set aside.

Petition by William D. Townsend for a writ of certiorari to review proceedings of the common council of the city of Sauk Centre removing him from office as mayor of the city for alleged misconduct in office. Order of conviction and removal from office reversed and proceedings instituted against relator dismissed.

*Calhoun & Bennett*, for petitioner.

*L. R. Barto*, for respondents.

CANTY, J.[2]

The city charter of Sauk Centre (Sp. Laws 1889, c. 4) authorizes the city council to remove "for cause" any person appointed to office by them, or elected by the people (section 4, c. 2 of charter), but it does not define what shall constitute cause.

On September 16, 1897, the council preferred charges of misconduct in office against the mayor; and on January 3, 1898, they tried him on these charges, found him guilty and, by resolution, removed him from office. A writ of certiorari was issued out of this court for the purpose of bringing up and reviewing the proceedings, a return was made thereto and the case was argued and submitted. Soon after the commencement of the removal proceed-

---

[1] Reported in 74 N. W. 150.    [2] BUCK, J., absent.

ings, a writ of prohibition was applied for and denied.  See State v. Ward, 70 Minn. 58, 72 N. W. 825.

The first specification in the charges states that the city council had "duly and lawfully purchased certain pieces of real estate situate in said city, for the public purposes and use of said city," from certain named persons, the owners thereof, for the sum of $1,700, and had duly appropriated that sum out of the general funds of the city for the payment of the same, and had directed an order to be drawn on the city treasurer for that sum, payable out of said fund to said persons; that the city clerk drew the order accordingly, presented it to relator Townsend, the mayor, for his signature, on August 23, 1897, and he, knowing all of said facts,

"Did then and there, wilfully, arbitrarily, wrongfully and unlawfully, and without any sufficient excuse therefor, refuse and neglect to sign his name, as mayor of said city, to said order, and has ever since refused and neglected so to do."

The second specification in the charges states that at a meeting held thereafter, on September 8, 1897, the council ratified and confirmed its former acts set forth in said first specification, again appropriated the money, and again directed an order similar in all respects to the first to be issued; that this was done, and the new order was presented to the mayor on September 10th for his signature; and that he again refused to sign the order, well knowing all the facts, and without any sufficient excuse therefor, etc., as charged in the first specification.

The evidence has been returned, and we are of the opinion that it will not sustain a conviction.  As held in State v. Common Council, 53 Minn. 238, 55 N. W. 118, a removal for cause must be for legal cause; and the court, on certiorari, "will examine the evidence, not for the purpose of weighing it, but to ascertain whether it furnished any legal and substantial basis for the removal."  We are of the opinion that in the present case the evidence does not furnish any such basis.

There is no evidence of any official misconduct on the part of the mayor, except such as may be inferred from the fact that he refused repeatedly to sign an order for the purpose stated in said

charges.   After the first order was presented to the mayor for his signature, and before the second was so presented, he sent the following communication to the council:

"To the City Council of the City of Sauk Centre:

"Gentlemen:—I return herewith, unsigned, city order No. 3,805, for $1,750, drawn to the order of Joseph Kraker and others, upon the general fund, for the purchase of the so-called 'Brewery Property'; and it is but just and proper that I communicate to you fairly and frankly my reasons for refusing to sign it.   They are three-fold, and, briefly stated, are:

"First. The financial condition of the city, in my judgment, will not warrant the expenditure of so large a sum of money for property which, at best, is only of prospective use.

"Second. The purchase of the property, whether for a park, or for possible use in connection with the waterworks and electric light plant, will entail a large immediate expenditure for its proper protection from the action of the water of the lake, and an annual expense for maintaining the work so done.   The cost of purchase and protection will exceed the value of the property to the city.

"Third. I do not understand that the taxpayers and citizens of the city demand its purchase, either as a site for a public park, or for the location of a future plant for the waterworks and electric lights for the city.

"While I recognize the right of the council to purchase and hold real estate and personal estate for public purposes sufficient for the convenience of the inhabitants, I am of the opinion that the property now proposed to be purchased will not contribute to such convenience.   If I am mistaken in my estimate of the wishes of the people in this particular, the only way to correct such mistake is to submit the proposition to a vote of the inhabitants, which I think should have been done before any contract for the purchase had been definitely agreed upon.   If such expression of the people shall be had, and it is in favor of purchasing the property referred to, I shall place no obstacle in the way.

"Believing as I do that public opinion would not justify the expenditure of so large a sum at this time for this purpose, I am constrained to return the order unsigned.

"Respectfully,

"W. D. Townsend."

Whether there was in fact any ground, either technical or substantial, on which the mayor was justified in refusing to sign the order, we will not attempt to decide, but will state a few reasons why he might have acted in good faith in refusing to sign either

the first order or the second. Section 6, c. 9, of the charter provides:

"Such city may purchase and hold real estate and personal estate for public purposes, sufficient for the convenience of the inhabitants thereof, and may sell and convey the same."

We have been referred to nothing in the charter which specifies who shall represent the city in such a purchase. Section 3, c. 3, of the charter, provides:

"All ordinances and resolutions shall, before they take effect, be presented to the mayor, and if he approve thereof, he shall sign the same, and such as he shall not sign he shall return to the common council with his objection thereto, by depositing the same with the city clerk to be presented to the common council at their next meeting thereafter."

Under the circumstances, the mayor might well suppose that he had a veto power on the resolution by which the council undertook to purchase the real estate in question. The mayor did not communicate to the council any reason for his refusal to sign the second order, but there are also other grounds on which he might in good faith have relied in refusing to sign it. For instance, section 6, c. 5, of the charter provides:

"No money shall be paid out of the city treasury unless such payment be authorized by a vote of the common council, and these shall be drawn out only upon orders by the mayor, and countersigned by the clerk, which orders shall specify the purpose for which they were drawn."

The second order did not state the purpose for which it was drawn, as required by this section. In the face of all of these facts, and others which might be mentioned, the evidence will not warrant a finding that the mayor acted in bad faith, or that he wilfully or perversely disregarded his duty.

Again, if it should be conceded that the proceedings were in all respects regular, and that it was his duty to sign the order, still the fact that he was mistaken as to his duty in this one instance would not show that he was generally incompetent to perform the duties of the office to such an extent as to warrant his removal on

the ground of incompetency. There are, indeed, few officers who are not likely at some time or another to commit an error of judgment in deciding as to what is their duty. Neither can impeachment proceedings be substituted for mandamus in every case where an officer mistakes his duty.

We are of the opinion that judgment should be entered herein adjudging that the orders convicting the relator on the said charges, and removing him from office, be reversed and set aside, and said proceedings so instituted against him for his removal be dismissed.

It is so ordered.