NOTE—See 2 C. J., pp. 476, 496, 906, 914; 4 C. J., pp. 931, 935; 7 C. J., p. 713; 8 C. J., pp. 214, 215, 883, 887, 891, 1098, 1099, 1101; 13 C. J., p. 712; 14 C. J., p. 61; 14A C. J., pp. 126, 127, 349, 350, 365, 376, 394, 408, 410, 491, 492, 595; 31 Cyc. 257; 40 Cyc. 2683.

---

# PEOPLE v. SHAWVER

(No. 1168, January 8th, 1924; 222 Pac. 11.)

QUO WARRANTO—PLEADINGS—DEMURRER—EVIDENCE—JUDICIAL NOTICE—CONSTITUTIONAL LAW—PUBLIC OFFICERS—STATE ENGINEER—VACANCIES IN OFFICE—STATES—CONFIRMATORY POWERS OF SENATE—REMOVAL OF OFFICERS—IMPEACHMENT—"MISCONDUCT OR MALFEASANCE" IN OFFICE—WORDS AND PHRASES.

1. Where no objection was made to prior pleadings, a demurrer to the reply will search the entire record as to matters of substance and require a consideration of the sufficiency of all pleadings.

2. In quo warranto to determine the right and title of the relator to office, his legal right to the office must affirm-

atively appear, but no presumption obtains in favor of respondent charged with obtaining possession of the office by force under an alleged appointment by the Governor.

3. No other mode having been provided by the Constitution or Laws for filling a vacancy in the office of State Engineer, the Governor has power under Const. Art. 4 Sec. 7 to fill such vacancy by appointment.

4. Courts will take judicial notice of matters of history pertaining to the state government as disclosed by legislative journals and other public records.

5. A uniform executive construction of Const. Art. 8, Sec. 5 relating to the office of State Engineer, that it provides for a succession of fixed terms of six years each, so that a vacancy during a term will constitute a vacancy in the term as well as in the office, to be filled for the unexpired part of such term, to be followed by a full term appointment upon the expiration of a previous full term, is entitled to much consideraiton, and if not controlling, sufficient at least, to justify its acceptance where its correctness is not questioned.

6. Where a state engineer resigned and the Governor appointed relator for the remander of the term, relator was entitled to hold until the appointment and qualification of a successor for the new term unless lawfully removed, or until a vacancy occurred through some other event than the mere expiration of the term for which he had been appointed, and an appointment for the new term to terminate his right to occupancy would require confirmation by the Senate, under Const. Art. 8 Sec. 5, Art. 4, Sec. 7, and Art. 6, subtit. ''Elections'' Sec. 4.

7. In quo warranto to determine the right and title to the office of state engineer, where it was claimed that relator's reappointment was invalid, allegations in the reply that it was understood that relator should continue as engineer and be appointed the Wyoming member of the Colorado River Commission, though having no force as establishing relator's right to the office under his reappointment, held not improper as an explanation of the reason for a delayed reappointment at the expiration of his term.

8. The Governor's neglect to send the name of an appointee as state engineer to the Senate during a session immeidately prior to the termination of his then term of office did not deprive the Governor of the power thereafter to appoint for a full or new term with the confirming ac-

tion of the Senate under Const. Art. 4 Sec. 7, Art. 8, Sec. 5, and Art. 6 Subtit. "Elections," Sec. 4.

9.  Under Const. Art. 8, Sec. 5, providing that a state engineer "shall be appointed by the Governor and confirmed by the Senate," the appointment and the confirmation need not be concurrent in point of time, and an appointment may be made during a Senate recess and be confirmed at its next session.

10. The appointment of a state engineer under Const. Art. 8, Sec. 5, during Senate recess, could be confirmed at the next session of the Senate, although the term of office of the Governor making the appointment had then expired, and neither the new nor the old Governor requested a confirmation, and the Senate was without executive communication concerning the appointment.

11.  The Senate of a state in the exercise of its power to consent to or confirm executive appointments to office, performs an executive or administrative, rather than a legislative function.

12.  The matter of an official appointment is not personal and the right to make it, does not attach to the person, but to the official upon whom that right is conferred.

13.  A state engineer is not removable by impeachment, under Const. Art. 3, Secs. 18 and 19, and may be removed by the Governor under Comp. Stats. 1920, Sec. 318, constitutional provisions as to impeachment including only the principal elective state officers mentioned in Art. 4, Sec. 11, and not officers appointed by the Governor.

14.  Comp. Stats. 1920, Sec. 318, in so far as it may authorize a removal of a state officer for other than misconduct or malfeasance in office, stated in Const. Art. 3; Sec. 19, as grounds for removal, is void as affecting the office of state engineer, created by Const. Art. 8, Sec. 5.

15.  Reasons assigned by the Governor for removal of the state engineer under Comp. St. 1920, Sec. 318, must be such as to constitute misconduct or malfeasance in office.

16.  In quo warranto to determine title to an office by one removed by the Governor under Comp. St. 1920, Sec. 318, the court may inquire into the existence of the jurisdictional facts, among which are whether the charges upon which the removing power acted were legal cause for removal, or whether the cause was sufficiently specified.

17.  That the state engineer caused or allowed his commission as state engineer, issued to him in 1921, by the Governor's predecessor to be presented to the Senate for con-

firmation without consulting the Governor, and without
the latter's knowledge, was not misconduct or malfeas-
ance in office warranting a removal under Comp. St. 1920
Sec. 318.

18.   Misconduct or malfeasance in office, warranting the re-
moval of a state officer under Comp. St. 1920 Sec. 318,
means official misconduct or malfeasance, rather than per-
sonal misbehavior alone not in any way affecting the in-
cumbent's fitness or capacity to perform the duties of
the office, as the power of removal cannot be exercised
whimsically or arbitrarily.

ORIGINAL proceedings in the nature of *quo warranto* by
the People of the State of Wyoming upon the relation of
Frank C. Emerson, against Casper D. Shawver to determine
the right and title to the office of State Engineer. Heard
on demurrer to relator's reply.

*C. L. Rigdon* for respondent; *D. J. Howell,* Attorney
General and *N. E. Corthell, amici curiae* for the demurrer.

A vacancy in the office of State Engineer occurred on
July 1st, 1919 by the resignation of James B. True; the
Governor had power to fill the vacancy by appointment;
Const. Art. 4, Sec. 7; relator was appointed to the vacancy;
he continued to hold the office lawfully under Const. Art.
6, Sec. 16 until his successor qualified; People v. Henderson,
4 Wyo. 535, 35 Pac. 517; there was no vacancy in the office
on April 11th, 1921, and the attempted reappointment of
Emerson on that date for a six year term was without legal
effect; the attempted confirmation of that appointment by
the Senate at its next ensuing session was without legal ef-
fect, since it was an attempted confirmation of an appoint-
ment made by a Governor long since retired from office; it
was not an appointment made "to the Senate" but in ef-
fect an appointment made until the legislature met. Peo-
ple v. Henderson, supra; the State Engineer is not subject
to impeachment but an officer within the meaning of Const.
Art. 3, Sec. 19, removeable by the Governor; it is not a state
office within the meaning of Const. Art. 3, Sec. 18 which ap-
plies to elective officers of the same class and character as

the Governor; State v. Grant, 14 Wyo. 54, 81 Pac. 795; State v. Hewitt, 3 So. Dak. 187, 52 N. W. 875; State v. Burke, 8 Wash. 412, 36 Pac. 281; People v. Dolan, 5 Wyo. 253, 39 Pac. 752; State v. Krueger, 134 Mo. 362, 35 S. W. 604; State v. Smith, 6 Wash. 496, 33 Pac. 974. The provision has been so construed by the legislature, Secs. 223, 318 C. S., 6 R. C. L. 63; State v. Trust Co., 143 La. 79; U. S. v. Graham, 250 Fed. 499; Martin v. Land Co., 94 Va. 28; Drainage Com'rs. v. Davis 108 S. E. 506; Hawley v. Anderson 195 Pac. 358. The power of the Governor under Sec. 318 C. S. is absolute when acting within the scope of his power; it cannot be reviewed by the courts; it gives the Governor a broad discretion not subject to review; State v. Grant, 14 Wyo. 54; State v. McGarry, 21 Wis. 496; State v. Prince, 45 Wis. 610; State v. Council, 9 Wis. 254; Atty. Gen. v. Brown, 1 Wis. 513; Yoe v. Hoffman, 59 Pac. 351; Lynch v. Chase, 40 Pac. 666; Lacey v. Young, 133 N. E. 90; Riley v. Crawford, 165 N. W. 345. Shawver's appointment was lawful and regular; allegations of the reply relative to the appointment of a commissioner under Chap. 120, L. 1921 are irrelevant; the statute fails to disclose a state policy such as is alleged in the reply; the demurrer should be sustained.

*W. L. Walls* and *W. E. Mullen for Relator.*

The demurrer to relator's reply will search the record as to the sufficiency of the answer and petition as to matters of substance; 6 Enc. P. P. 326, 31 Cyc. 338; Bliss C. P. 417, Philp. C. P. 85. In the absence of prior objections and rulings, 21 R. C. L. 530. The office of State Engineer was created by the Constitution, Art. 8, Sec. 5; it is a state office, State v. True, 26 Wyo. 324. It has a fixed term which cannot be shortened by the legislature, analogous to that of District Judge, Const. Art. 5, Sec. 19; State v. Schnitger, 17 Wyo. 77, 96 Pac. 238; nor vacated except in the manner prescribed by law, State v. Jefferis, 26 Wyo. 115, 178 Pac. 909; being an appointive office does not imply

inferiority; it is a superior office with broad powers, 159-167 C. S.; it differs in certain important essentials from the office of State Examiner, Art. 4, Sec. 14; the rule announced in the Henderson case, 4 Wyo. 535 is distinguishable, that case being governed by a statute and the sweeping provisions of Const. Art. 6, Sec. 15. "Successor" means one legally chosen, Ballintyne v. Bower, 17 Wyo. 356, 99 Pac. 869. The Henderson appointment was made until the legislature met, State v. Henderson, supra; the State Examiner is appointed with the advice and consent of the Senate; the Engineer is appointed by the Governor and confirmed by the Senate; there is a distinction in language relating to these appointments, indicating a difference of intention, State v. Brooks, 14 Wyo. 393, Art. 8, Sec. 5. A regular appointment of State Examiner requires joint action of the Governor and the Senate; an appointment to the office of engineer may be confirmed by the Senate at its next ensuing session, State v. Williams, 222 Mo. 268, 17 Ann. Cas. 1006, and note. State v. Murphy, 32 Fla. 138, 13 So. 705; Shepherd v. Haralson, 16 La. Ann. 134; State v. Rareshide, 32 La. Ann. 934; State v. Lamantia, 33 La. Ann. 446; Mechem Pub. Ofc. 1st Ed. S. 134; Dyer v. Bayne, 54 Md. 87; State v. Kuhl (N. J.) 17 Atl. 102. Confirmatory powers of the Senate are executive and not legislative, State v. Schnitger, 16 Wyo. 514-516; State v. Barber, 4 Wyo. 56; relator's appointment in April 1921 for a full term was intended to comprehend extra service to be imposed by his appointment as a member of the Colorado River Commission under Chap. 120 L. 1921, but without extra compensation; the salary of engineer was increased by Chap. 95 L. 1921; the attempted removal of relator was without legal authority or grounds; the office is a state office, Art. 8, Sec. 5; State v. True, supra of broad discretionary powers, Laughlin v. Board, 21 Wyo. 99, 128 Pac. 517; Big Horn P. Co. v. State, 23 Wyo. 271; 836-850 C. S. The incumbent is liable to impeachment under Art. 3, Sec. 18, but not removal; under Art. 3, Sec. 19; he may be suspended pending

impeachment, Art. 6, Sec. 16, 90-91 C. S. The removal statute Sec. 318 C. S. is broader than Art: 3, Sec. 19 and to that extent is void; the misconduct or malfeasance referred to must relate to duties of the office; Constitutional offices are immune from legislative changes, 22 R. C. L. 382; People v. Howland, 155 N. Y. 270, 49 N. E. 775; Richie v. Phila., 225 Pa. St. 511; 74 Atl. 430, 26 L. R. A. (NS) 289; Com. v. Reid, (Pa.) 108 Atl. 829. The reasons assigned for removal do not relate to official duties and are insufficient, 22 R. C. L. 571; McCully v. State, 102 Tenn. 509, 16 L. R. A. 567; State v. Duluth, 53 Minn. 238, 55 N. W. 118; Atty. Gen. v. Crowley, 75 N. H. 393; Village v. Kendrick, 89 Pac. 755. The statute may be upheld in part. State v. Frear (Wis.) 131 N. W. 832, 34 L. R. A. (NS) 480; Hunt v. Court, 173 Pac. 1097. "Misconduct or malfeasance in office" means unlawful behavior in relation to the duties of the office. Collier v. State, 55 Ala. 155; Dunlap v. Curtis, 10 Mass. 210, Cyc. L. Dict. 375; Breckenridge v. State, 27 Tex. App. 513; State v. Welch, 109 Ia. 19; 79 N. W. 369; Cutter v. State, 36 N. J. L. 125; White v. State, 56 Ga. 585; Yoe v. Hoffman, 61 Kan. 265, 59 Pac. 351; State v. Stover, 113 Mo. 208, 20 S. W. 788; Miller v. Roby, 9 Neb. 471, 4 N. W. 65; Section 318 C. S. is in conflict with the Constitution. It was upheld in State v. Grant, supra for the reason that the grounds of removal were not questioned. A statement of ground of removal by the Constitution is an implied prohibition of the inclusion of others by the legislature, Mechem 1st. Ed. 457; Com. v. Williams, 79 Ky. 42; 42 Am. Rep. 204. The legislature cannot add to the constitutional grounds for removal of officers, Lowe v. Comm., 3 Metc. (Ky.) 237; Brown v. Grover, 6 Bush 1; State v. Weltz, 11 La. Ann. 489; Goodin v. Thomas, 10 Kan. 191; State v. Draper, 50 Mo. 353; State v. McNeeley, 24 La. Ann. 19; People v. Draper, 15 N. Y. 532; State v. Baker, 38 Wis. 71; Comm. v. Sutherland, 3 Serg. & R. 145; "Removal of Public Officers," 25 A. L. R. p. 201. Especially where the term of office is fixed by the Constitution, Peo-

ple v. Dubois, 23 Ill. 547; State v. Messmore, 14 Wis. 163; Comm. v. Gamble, 62 Pa. St. 343.   The misconduct must relate to official duties, Com. v. Williams, supra; Com. v. Chambers, 1 Marsh 160.   An appointee cannot be removed by arbitrary will of the Executive, State v. Court, 92 Wash. 375, 159 Pac. 84; Biggs v. McBride, 17 Ore. 640, 21 Pac. 878, 5 L. R. A. 115, 22 R. C. L. 282; State v. Duluth, supra; Kendrick v. Nelson, 89 Pac. (Ida.) 755, Ann. Cas. 1912A S. 1290; Cooley's L. 6th Ed. 78; 22 R. C. L. 265; People v. Holland, 155 (N. Y.) 270, 41 L. R. 838.   The grounds of removal assigned by the Governor do not constitute misconduct or malfeasance in office; the Senate had independent power to act in confirming relator's appointment.

*C. L. Rigdon* for Respondent in Reply.

The office of State Examiner and State Engineer differ in no respect as to the method of appointment; the confirmatory power of the Senate is the same in each; relator's appointment in April 1921 was not made to the Senate and it could not confirm an appointment not officially communicated to it by the appointing power, even if the appointment of April 1921 was within the power of the Governor it expired upon adjournment of the succeeding legislative session, and the appointment of Shawver was legal; whether relator held under his first or under his second appointment, or whether the confirmation by the Senate was lawful, has no bearing on the right of removal; the grounds of removal constituted misconduct, and misconduct is not limited to misconduct in office.   Balen v. Colfax Cons. Coal Co., 168 N. W. 246; West Shore Ry. Co. v. State Board of Texas, 104 A. 335; Newman v. Garfield, 104 A. 881; State v. Follis, 205 S. W. 444; Appl. of Pa. St. Camp. 104 A. 590; State v. Bernquist 171 N. E. 101.   Courts will attempt to give all portions of a statute a meaning where possible, State v. Embrey, 204 S. W. 1139; State v. Amos, 79 So. 433; State v. Lewis, 120 N. E. 129; Harris v. Bell, 250 Fed. 209.   This distinction was recognized in State v. Grant,

supra.    Unless misconduct extends to matters outside the
office it would be impossible to provide for the removal of
an officer convicted of crime, Karoly v. Indust. Com. of
Colo. 176 Pac. 284; Western Lbr. Co. v. City of Golden,
124 Pac. 584; Atty. Gen. v. Marx, 168 N. W. 1005; In re
Grant, 7 Moore, C. P. 141, 13 Eng. R. P. 833.    The legis-
lature is not restricted as to grounds of removal, People
v. Dreher, 134 N. E. 22; Lee v. Brd., 3 Wyo. 52, 31 Pac.
1045.    The legislature may extend the provisions of the Con-
stitution, State v. Pauley, (N. D.) 192 N. W. 91; In re
Com'rs., 32 Pac. 850.    The maximum, *"expressio unius est
exclusio alterius"* does not apply.    McGrew v. Mo. Pac.
Ry. 132 S. W. 1076; Shartleff v. U. S. 23 Sup. Ct. Rep. 536;
State v. McAllister, 18 S. E. 770; State v. Wilson, 175 S.
W. 603; Nunnnsmacher v. State, 108 N. W. 627; People v.
Stuart, 74 Mich. 411, 41 N. W. 1091, 16 A. S. R. 644; Wig-
ley v. S. Son.    Joaquin Irr. Dist., 159 Pac. 985; McComa
v. Krug, 81 Ind. 327.    In order to ascertain how far an af-
firmative or negative provision excludes or implies others,
we must look to the nature of the provision, McGrew v.
Mo. Pac. Ry. Co., supra.

POTTER, Chief Justice.

This is a proceeding in the nature of quo warranto,
brought in this court to determine the right and title to
the office of State Engineer, thereby invoking the original
jurisdiction of the court in quo warranto as to all state
officers granted by the constitution.    Art. V. Sec. 3.    The
case has been heard upon a demurrer to the reply which,
when first presented, we held would search the entire rec-
ord as to matters of substance and require a consideration
of the sufficiency of the answer, as well as the petition, no
previous objection having been made to either of those
pleadings.    And for that reason we declined to consider
alone a question as to the legal effect of certain facts al-
leged for the first time in the reply.    In announcing that
conclusion the following authorities were cited:    6 Ency.

Pl. & Pr., 326, et seq; 31 Cyc. 338 et seq; Bliss on Code Pleading, 2nd Ed., Sec. 417a; Phillips on Code Pleading, Ses. 85; 1 Kinkead's Code Pleading, p. 96, Sec. 94, p. 112, Sec. 116; 21 R. C. L., pp. 530, 531, Sec. 92; Headington v. Neff, 7 Ohio 229, pt. 1; Hellier v. Stewart, 26 O. S. 652; State v. L. & N. R. Co., 51 Fla. 311, 40 So. 885; Finch v. Galigher, 181 Ill. 625, 54 N. E. 611; Carlson v. People ex rel. 118 Ill. App. 592. The case was then argued and submitted upon that theory, and is therefore, before us upon the facts alleged in pleadings.

The pleadings do not present any substantial dispute as to the facts, for while there are denials in the answer and reply, they relate to the legal effect of facts either admitted or not specifically denied. The petition alleges in substance: That the relator was appointed State Engineer by Governor Robert D. Carey on July 1, 1919, to fill a vacancy caused by the resignation of James B. True; that he qualified and entered upon and discharged the duties of said office until, on April 4, 1921, while holding under said appointment, Governor Carey again appointed him for a term of six years from and after April 1, 1921, and on that date commissioned him for that term. That thereupon he again qualified as required by law, and at the next succeeding legislative session in 1923 the senate confirmed said appointment, and that relator after said appointment, prior to and after its confirmation, continued in possession and exercised the duties of said office. But that on March 15, 1923, the respondent, Casper D. Shawver, accompanied by the Sheriff of Laramie County, appeared at the Engineer's office in the Capitol building, and demanded that relator surrender possession of the office to him, which he claimed under an appointment, void "as relator is advised and believes," made by Governor Ross without the advice and consent of the Senate and when the Senate was not in session. That the said sheriff declared that if relator did not surrender the office he, the sheriff, pursuant to oral

instructions from the Governor, would physically remove relator therefrom; and upon relator's refusal, the said sheriff "acting in the aid and assistance of respondent," seized and forcibly removed relator from the office; whereupon the respondent assumed possession and control of said office to the exclusion of relator, and has since usurped and occupied said office to the exclusion of relator, and pretends to act in the capacity of state engineer, claiming the emoluments of the same.

The answer admits relator's appointment on July 1, 1919, and his qualification and performance of the duties thereunder, but denies that he was lawfully appointed on April 4, 1921; denies that it was lawfully confirmed, and alleges that if relator held said office at any time he held it solely by the appointment of July 1, 1919. The answer admits that on or about April 15, 1923, the respondent took possession of the office and excluded relator therefrom and has since said date remained in possession and control thereof to the exclusion of relator, but denies that he has usurped or intruded into or occupied the office unlawfully. It is further alleged in the answer that on March 13, 1923, Governor Ross, by written communication addressed to relator and also filed in the office of the Secretary of State, subject to inspection by any person interested, removed relator from said office, and thereupon appointed the respondent and issued a commission to him, purporting to appoint him to said office for the term of six years from March 15, 1923, and that respondent duly qualified thereunder.

The reply denies that relator has been lawfully removed or that the Governor had lawful authority to remove him. It denies that the Governor had any power or authority to appoint respondent on March 15, 1923, or at all, or to issue a commission to him, but alleges that said appointment and commission were beyond the Governor's power and conferred no authority upon respondent to take possession

of the office or to exclude relator therefrom, and that said exclusion amounted to an unlawful and unwarranted occupation of it by the respondent. The reply further alleges the appointment of relator, and certain conditions thereof, under a statute enacted in 1921, as commissioner to represent this state on a joint commission to negotiate a compact between certain named western states, including Wyoming, and the United States, relative to the future utilization and distribution of the waters of the Colorado River and its tributaries. And that is the new matter sought to be eliminated by the demurrer to the reply. In substance the averments in that respect are that relator was appointed as such commissioner without compensation other than the salary allowed for the State Engineer under a statute of 1921 increasing the same, in furtherance of the intention and policy of the Legislature and the Governor that relator *as State Engineer* should perform the additional duties of commissioner; that his appointment as said commissioner, which office he still holds, was during the pleasure of the Governor; that he performed the duties of both offices, attending numerous sessions of the commission during 1921 and 1922, which resulted in an interstate agreement known as the "Colorado River Compact," ratified and approved by the Legislature and Governor of this state at the session of 1923.

We shall first consider as a question of primary importance, the title of the relator to the office and his right to hold the same prior to and at the time of the alleged proceedings to remove him. That and the other questions in the case will be considered, having in view the principle that the legal right of the relator to the office must affirmatively appear, but without indulging in any presumption in favor of the respondent by reason of the fact of his possession of the office under an alleged appointment by the governor. Having, as alleged, forcibly obtained possession, he is not entitled to the benefit of any such presump-

tion on this hearing, whatever might otherwise be the rule in a case of this kind. A presumption based upon possession, if recognized at all in this case, should be applied in favor of relator, who for nearly four years was in undisturbed possession of the office until he was forcibly ejected from the official rooms in the manner alleged. Ekern v. McGovern, 154 Wis. 157; 142 N. W. 595, 46 L. R. A. (N. S.) 796.

The office of State Engineer is provided for in the Constitution of the state in these words:

"There shall be a state engineer who shall be appointed by the governor of the state and confirmed by the senate; he shall hold his office for the term of six (6) years, or until his successor shall have been appointed and shall have qualified. He shall be president of the board of control, and shall have general supervision of the waters of the state and of the officers connected with its distribution. No person shall be appointed to this position who. has not such theoretical knowledge and such practical experience and skill as shall fit him for the position."

These provisions are found in Section 5 of Article VIII of the Constitution. That article is entitled "Irrigation and Water Rights," and it provides also for four water divisions to be defined by the legislature, and for the supervision of the public waters of the state, their appropriation, distribution and diversion, and of the various officers connected therewith, by a Board of Control, to be composed of said engineer and the superintendents of said water divisions.

The constitution also provides: "When any office from any cause becomes vacant, and no mode is provided by the constitution or law for filling such vacancy, the governor shall have the power to fill the same by appointment." Art. IV, Sec. 7. And that applies to the office here in question, and controls the filling of vacancies therein. It

is further provided in that instrument that, excepting members of the legislature and members of a board two or more of whom are elected at the same time, every person holding any civil office under the state or any municipality therein, shall, unless removed according to law, exercise the duties of such office until his successor is duly qualified. Art. VI, Subtitle "Elections," Sec. 4, (sometimes referred to as section 16 of said article.)

The case has been submitted in much the same manner as though there had been an agreed statement of facts; the several facts known by all parties to have existed being assumed. Some facts, however, deemed by us to be more or less important are not definitely alleged in either of the pleadings. For example, there is no averment stating the facts of the James B. True appointment such as the date thereof, the term for which he was appointed, the date of its expiration, nor the term of any prior incumbent. Neither is it averred whether the legislature was in session when Mr. True's term expired or at the time of relator's 1921 appointment, or after that prior to January, 1923. But the fact that Mr. True's term had expired has been assumed, and we know that to have been the fact as determined by his appointment as well as that the legislature was not in session at the time of said 1921 appointment, but had adjourned the 1921 session a day or two before the expiration of the stated term of Mr. True, and six weeks or more before the second appointment of relator. Whether either of such facts or others of the same nature may be vitally material or not, so far as they are pertinent they are matters of history of our state government, shown by legislative journals and other public records, of which we may take judicial notice. 23 C. J. 90-93, 120.

Of such facts we think proper to mention the following: Mr. True's name was sent to the senate with a request for confirmation, on February 9, 1915, and his appointment

confirmed on that date, for the full term of six years from February 20, 1915; that being the date of the expiration of the previous six year term for which Clarence T. Johnston had been appointed and confirmed in 1909, and for the remainder of which term Adrian J. Parshall was appointed and confirmed at the legislative session of 1911, upon Mr. Johnston's resignation. And the procedure in the appointments of Parshall and True followed an established practice respecting this office, disclosing a uniform executive construction of the constitutional provisions relating to the term thereof and the filling of vacancies therein, apparently concurred in by one branch of the legislative department, the senate, viz: that it provides for a succession of fixed terms of six years each, so that a vacancy from any cause during a term will constitute a vacancy in the term as well as in the office, to be then filled for the unexpired part of such term, and a full term appointment after the first to be made only upon or in contemplation of the expiration of a previous full term.

Thus upon the resignation of Mr. Mead, the first state engineer, during his second term of six years, the vacancy was filled by the appointment of Fred Bond on July 15, 1899, until the next session of the legislature, and at that session (1901) he was again appointed, the senate confirming the same, for Mr. Mead's unexpired term. When that term was about to expire in 1903, Mr. Bond was appointed and confirmed for a full term of six years, "ending February 21, 1909." Upon his death during 1903, Clarence T. Johnston was appointed, and at the next session of the legislature (1905) was appointed and confirmed for Mr. Bond's unexpired term. When that term was about to expire, Mr. Johnston, having continued to occupy the office, was appointed and confirmed for a full term of six years from February 20, 1909, during which he resigned to be succeeded by Mr. Parshall, as above stated. The propriety of the said practice of the executive and one branch

of the legislative department of our state government, or the construction of the constitutional provisions indicated thereby, has not been questioned as to said office in this court and is not questioned in this case. And, under the circumstances, if there might be any doubt about it, such continued practical construction during a period of more than twenty years would be entitled to much consideration, and, if not controlling, sufficient at least to justify its acceptance by the court for the purposes of a decision in this case, without inquiring whether it may fully accord with the general rule of judicial construction.

The appointment of the relator in 1919 was for the period from July 1, 1919 to February 21, 1921, and was clearly intended to cover, as it did, the entire unexpired term aforesaid of his predecessor. It was then known, however, because of the constitutional limitation upon the length of each biennial session of the legislature, that the date of the expiration of such term would follow very closely the adjournment date of the next session to convene in January, 1921, allowing a successor for the new term to be selected at that session by appointment and confirmation, as provided in the constitution; and we may assume that to have been understood when the vacancy appointment was made. That was a completed appointment to fill a vacancy, requiring no action by the senate. Under it the relator was entitled to hold until the appointment and qualification of a successor for the new term, as provided by law, unless lawfully removed, or until a vacancy through some event other than the mere expiration of the term for which he had been appointed. That is conceded by counsel for respondent, upon the authority of State ex rel Richardson v. Henderson, 4 Wyo. 535, 35 Pac. 517, 22 L. R. A. 751, which settles the question for us in this case, and also the proposition that an appointment for a new term, to terminate the right of an incumbent to hold over, would require confirmation by the senate.

That case involved the office of State Examiner, which the constitution directs shall be provided for by the Legislature, the incumbent to be appointed by the governor and confirmed by the senate. The office was promptly created by an act of the first state legislature providing that the Examiner shall be appointed by the governor by and with the advice and consent of the senate, for a term of four years, ''and until his successor in office is appointed and shall have qualified,'' and that in case of a vacancy in the office, the governor shall fill the same by appointment until the next meeting of the legislature. A vacancy having occurred by resignation during the four year term of the first incumbent, who had been appointed soon after the approval of said act creating the office, the governor, on December 20, 1892, appointed and commissioned Harry B. Henderson to fill the vacancy, ''to hold the office until the next meeting of the Legislature,'' which, under the constitution, would and did convene on January 10, 1893. Said vacancy appointee duly qualified and was continuing to discharge the duties of the office after the adjournment of said 1893 session of the legislature, when an action was brought to determine the title thereto by one who had been appointed and to whom a commission had been issued, but without attestation by the Secretary of State, after said adjournment ''for the unexpired term of Harry B. Henderson, whose said office became vacant on the 10th day of January, 1893.'' The appointment of said relator Richardson had not been confirmed by the senate. The court, in deciding that case, construed what was referred to in the decision as Section 16, Article VI of the constitution, but more properly cited as Sec. 6, subtitle ''Elections,'' of said article, providing for the exercise of the duties of any civil office by the person holding the same until his successor has qualified, ''unless removed according to law,'' and Sec. 7 of Art. IV, authorizing the governor to fill a vacancy in any office

by appointment, when no other mode has been provided by the constitution or law for filling the same, and also the statutory provisions for filling a vacancy in said office of Examiner by appointment until the next meeting of the legislature, and that the examiner shall hold his office for four years and until his successor in office is appointed and shall have qualified. The court held that the general provision aforesaid of Article VI applied to the one appointed to fill the vacancy in the office of examiner, and that the mere expiration of a term or the period for which a vacancy appointment is made, does not constitute a vacancy permitting a provisional or temporary appointment by the Governor, and also that an appointment by the Governor without the advice and consent of the senate would not deprive said vacancy appointee of his right to continue to exercise the duties of the office. The court said:

"Without some statutory regulation of the matter, a vacancy can only exist in an office when there is no lawful incumbent occupying it. An office cannot be said to be vacant while any person is authorized to act in it, and does so act. * * * A careful reading of the numerous decisions of the American courts on the question is convincing that the doctrine is too well entrenched to be dislodged at this time, that where a constitutional or statutory provision exists permitting or commanding an incumbent of an office to continue in the discharge of his duties until his successor has qualified, it must be construed as controlling, *and the expiration of the official term cannot be deemed a vacancy, unless there is some legal successor appointed or elected by some competent authority to take the place of the incumbent.* * * * This successor must be one appointed by warrant or authority of law, and not in the absence of it. There would be no sense in the position that a vacancy can be created by an attempt to fill a vacancy, nor in the view that one appointed to fill a vacancy can

be succeeded by another to fill the same vacancy, where the provisional appointment is made from the same source. The vacancy is already filled by the governor's appointment, and there is no reason why the appointee should be displaced by one appointed by a succeeding governor.''

In the concluding part of the opinion, the court said:

''At that time, (the next meeting of the legislature) a new appointment was necessary and proper, as is conceded, but such appointment could then have been made only * * * by and with the advice of the Senate.''

That case has been frequently cited with approval, and is referred to as containing a full review of the authorities supporting the text in 6 Ency. L. 2nd Ed. 1012, Note 3. But there was a suggestion at the argument that the views expressed in the case as to what constitutes a vacancy may not accord with the modern trend of authority. We have found no evidence of that. On the contrary the later decisions and comments on the subject very plainly tend to strengthen the court's decision in that case. According to the rule of a few of the cases, where an office is regularly to be filled by executive appointment and confirmation, and a term has expired, an appointment may be made alone by the governor, effective from its date until rejected or disapproved by the senate or confirming body, notwithstanding a statutory or constitutional provision authorizing the incumbent of the previous term to hold over until the appointment and qualification of a successor. State ex rel v. Murphy, 32 Fla. 138, 13 So. 705; State v. Williams, 222 Mo. 268, 121 S. W. 64, 17 Ann. Cas. 1006. It was held in People v. Mizner, 7 Cal. 519, that though a vacancy did not occur on the expiration of the term, during a recess of the senate, the governor might then appoint for the new term vesting the office in his appointee subject to be defeated by the non-concurrence of the senate.

The cited Florida case was referred to in the opinion in the Henderson case and was distinguished as well as disapproved.

The decision in the Missouri case was based upon the fact that the first appointment to a statutory office was necessarily made during the recess of the senate for a prescribed term of four years, stating the date that the term would end; and it was held that all subsequent terms must end on the same date at intervals of four years, so that one whose term had so ended could not continue in office as against a successor appointed for the full term, even though such appointment had not been confirmed, for, as also held, it might be confirmed at a subsequent session of the senate. The decision involved the construction of statutes providing for filling vacancies and for the holding over by an incumbent, and much consideration was given to a uniform course of executive procedure. The theory of that decision seems, however, to be that a vacancy occurs upon the expiration of the term of an appointive office, authorizing an appointment for the new term, and ending the right of an incumbent of the former term to hold over. The cases adopting that theory are exceptional, and conflict not only with the decision of our own court in the Henderson case, but with the great weight of authority establishing the contrary as the settled rule; though, of course, that rule does not interfere with the filling of an office at the time and in the mode provided by law, at or in contemplation of the expiration of the term for which the incumbent has been elected or appointed. People v. Bissell, 49 Cal. 407; State ex rel v. Howe, 25 O. S. 588, 18 Am. Rep. 321; State ex rel v. Metcalfe, 80 O. S. 244, 88 N. E. 738; Smoot v. Summerville, 59 Md. 84; Brady v. Howe, 50 Miss. 607; State ex rel v. Bowden, 92 S. C. 393, 75 S. E. 866; Tappan v. Gray, 9 Paige 507, 7 Hill 259; People ex rel v. Sohmer, 209 N. Y. 151, 102 N. E. 593, 46 L. R. A. (N. S.) 1202, and note; State ex rel v. Compson,

34 Or. 25, 54 Pac. 349; State v. Harrison, 113 Ind. 434, 16 N. E. 384, 3 Am. St. Rep. 663; State v. Bryson, 44 O. St. 457, 8 N. E. 470; People ex rel v. Cazneau, 20 Cal. 504; People v. Tyrrell, 87 Cal. 475, 25 Pac. 684; State v. Boucher, 3 N. D. 389, 56 N. W. 142, 21 L. R. A. 539; People ex rel v. McIver, 68 N. C. 467; Branham v. Long, 78 Va. 352; Barrett v. Duff, 114 Kan. 220, 217 Pac. 918; Terry ex rel v. Mann, 16 N. M. 744, 120 Pac. 313; State ex rel v. Perkins, 35 Okl. 317, 129 Pac. 730; Mechem on Pub. Off., Sec. 128; 23 Ency. L. 346; Throop on Pub. Off. §§ 328-331; see also citation of authorities in note to Wendorff v. Dill, 50 L. R. A. (N. S.) 368. And, generally, a vacancy appointee holds over the same as an incumbent for a full term. Throop, § 331.

Several of these cases and others are referred to in the opinion in the Henderson case. The Ohio case, above cited, of State v. Metcalfe, was decided in 1909, and the court quotes from State v. McCracken, 51 O. S. 123, 36 N. E. 941, as follows: "In contemplation of law, there can be no vacancy in an office so long as there is a person in possession of the office legally qualified to perform the duties," and adds: "Other judicial utterances of like import can be cited but it cannot be necessary." The facts in the South Carolina case of State v. Bowden, decided in 1912, were: The governor's appointment of magistrates had been confirmed in February, 1909. They were each appointed for a two-year term. No appointments were sent to the senate at the session in 1911, but after the adjournment thereof, the governor undertook to appoint three others as successors to those appointed and confirmed in 1909. Those appointments were submitted to the senate at its session in 1912, and rejected. The court stated that the authority of the governor to appoint magistrates is conferred and limited by the constitution, and if the later appointments were not made in accordance therewith, they were of no effect, under the "universally rec-

ognized" principle that the governor of a state has no inherent power of appointment to office but that his power must be found in the constitution or statutes; that the constitution conditions the governor's power of appointment "on the advice and consent of the senate;" that an appointment for the full term without the consent of the senate, is beyond the governor's power; and that the term of office of magistrates being fixed by the constitution at two years, and until their successors are appointed and qualified, one who is appointed to the office and confirmed holds the office until the expiration of two years and until his successor has been appointed by the governor with the advice and consent of the senate and has qualified. And thereupon the court further said:

"The failure of the governor to appoint, or of the senate to act upon the appointment, or the rejection by the senate of the appointment of the governor, does not create a vacancy. * * * To take any other view would be, not only to erase words from the constitution, but to attribute to the constitutional convention and the general assembly the purpose to empower the governor to exercise sole control of the appointments of magistrates of the state in total disregard of the constitutional safeguard that his appointment should be subject to the advice and consent of the senate. * * * No citation of authority can make the matter plainer than the words of the constitution, but we think it safe to say that the courts have held with complete unanimity that, when a term of office is fixed by law at a term of years and until the appointment or election and qualification of a successor, the term of the incumbent does not end, and there is no vacancy until the expiration of the time named, and the appointment or election and qualification of his successor."

The New York case of People ex rel v. Sohmer was decided in 1913. It was thereby decided in substance, as

stated in the syllabus in 46 L. R. A. (N. S.) 1202, that under a statute providing that an office shall be deemed vacant after the expiration of a term for the purpose of choosing a successor, the governor cannot, where the term expires while the senate is in session, appoint a successor upon the resignation of the incumbent after its adjournment, although such incumbent, under the statute, held over until his successor was appointed; other portions of the statute providing that a vacancy in the office of one appointed by the governor, with the advice of the senate, shall be filled in the same manner as the original appointment, but giving the governor an interim power of appointment if a vacancy occurs other than by expiration of the term while the senate is not in session, and declaring that an office may become vacant by resignation before the expiration of the term. The court divided upon the question of the creation of a vacancy upon the resignation of the hold-over incumbent; the majority view being that since the office became vacant by statutory declaration, for the purpose of choosing a successor, at the expiration of the term which occurred while the senate was in session, that vacancy continued, rendering the incumbent's resignation of no effect in creating the vacancy, and preventing the office from being lawfully filled by appointment of the governor alone, as in case of a vacancy occurring during a senate recess. The general rule as to vacancies where an incumbent holds over does not seem to have been questioned, but inferentially recognized. And that rule was expressly recognized in the dissenting opinion, wherein it was said by Chief Justice Cullen:

"The failure to appoint or elect a successor in office, or a failure of such successor to duly qualify, would not create a vacancy, because despite of such failures, there would be a person entitled by law to continue in the office and discharge its duties. The scheme of officials holding

over despite the expiration of the original term is prevalent in this state from early times, and also is prevalent in other states. The decisions are uniform, both in this state and in the other states, so far as they are cited to us by the Attorney General, that where there is a provision for holding over, there can be no vacancy in the office.''

And we quote the following from the L. R. A. note to that case:

''It has already been stated that the courts are quite generally agreed that, so long as there is a person legally authorized to hold the same and discharge its duties, whether he be the one lawfully elected or appointed for a fixed term or whether he be a hold over, there is no vacancy within the meaning of statutory or constitutional provision authorizing special or temporary appointment by the executive. As an illustration of the attitude of the courts on this more general question, reference may be had to an early New York case denying the right of the governor to appoint, even where the term expired after the legislative adjournment, and holding that the sole object of such an *ad interim* appointment was to prevent a public injury through want of an incumbent until appointment could be made in the regular mode, and that where there was a hold-over provision there was no vacancy entitling the governor to appoint. Tappan v. Gray, 9 Paige 507, affirmed in 7 Hill, 259. So it is when courts come down to the question of *ad interim* appointments where the term expires during a session of the legislature, but the statute provides for holding over. In such circumstances the courts hold in the case of an officer appointed by the legislature or either body thereof, or by the governor by and with the advice and consent of the legislature or either body, that there is no vacancy at the end of the term, since the 'hold-over' provision is expressly designed to meet such a contingency, and that the governor cannot

exercise his special power of appointment when the term of office expires during a legislative session.''

We cannot close the discussion of this question without referring to a case recently decided in Colorado, Walsh v. People, 72 Colo. 406, 211 Pac. 646, which, viewing the question from a different standpoint, demands and has received our very careful and respectful consideration. We do not understand the decision to disagree with the general rule above stated, where there is an incumbnt entitled to ''hold over.'' But it construes a constitutional provision like that in Article VI of our constitution for the continued exercise of the duties of an office by a holding incumbent until his successor shall have been duly chosen and qualified, as authorizing something less than a holding over, and implying that the incumbent becomes a mere ''*locum tenens.*'' Upon that construction the court upheld an appointment, notwithstanding it purported to be made for a new term; and in that respect the case differs essentially from the decision of this court in the Henderson case. That learned court, however, in its reference to the Henderson case, seems to have overlooked the fact that the statute providing for the office of examiner, considered in that case, expressly provides that the examiner shall ''*hold his office* for four years *and until his successor is appointed and shall have qualified.*'' And that right would, as generally held, vest also in a vacancy appointee. But it is true that in the Henderson case the constitutional provision aforesaid, found in Article VI, was construed as conferring the same hold-over right, and the same construction of the provision is found as to another office in Ballantyne v. Bower, 17 Wyo. 356, 99 Pac. 869, 17 Ann. Cas. 82. In the Colorado case some effect seems to have been given to another provision of the Constitution of that state, authorising the governor in case of a vacancy to appoint a person ''to *discharge the duties of the office* until the next meeting of the Senate, when he shall nominate

some person *to fill the office,"* (italics ours), which, the opinion states, uses the words "discharge the duties" in contradistinction to the words "to fill the office." We do not have a provision like that in our constitution or statutes. Notwithstanding that difference, perhaps slight only, between the constitutional provisions, the opinion is respectfully expressed in the Colorado case that this court in our two cases aforesaid misconstrued the provision for exercising the duties of an office by one holding it until the selection and qualification of a successor, in giving to it the same effect as a provision for holding over the term, and our said decisions seem to have been understood by the learned court in that case, as the only decided cases, with a single stated exception, depending upon a provision like that in their constitution and our own for "exercising the duties of the office."

We are not at all convinced that said provision in Article VI of our constitution was misconstrued in either of the two cases above mentioned decided by this court, but if we had now any doubt about it we should regard the question as fully settled for this state by said decisions. But the premise that no decisions other than those in our two cases and perhaps one case in another state, have depended upon similar enactments is, we believe, erroneous. The same provision was construed in *at least* two other cases, the early New York case of Tappan v. Gray, 9 Paige 507, establishing the rule in that state, and the California case of People v. Tyrrell, supra. We have not taken time to examine others.

The opinion in the case of Tappan v. Gray shows that the court did not perceive any substantital difference between a provision that an officer shall hold over and one that he shall discharge the duties of the office after his term. Nor do we. But the language of the provision in our constitution is: that "every person *holding* any civil office  *  *  *  shall, unless removed according to law, exercise the duties of such office." The one who "holds"

the office, unless "removed," is granted the authority. In our opinion, the provision cannot mean anything less than that he remains, unless removed, while continuing to discharge its duties, the lawful incumbent of the office, and with the same title he was holding under for the term. The point is not, perhaps, important in the case now before us, for the reason that the engineer is authorized by the provision of the constitution creating the office to *hold his office* for the term of six years or until his successor is appointed and qualified. Nevertheless the other provision of Article VI also applies, but with the same effect.

There was, therefore, no vacancy in 1921, authorizing appointment on that ground, and a new term appointment would require confirmation. But relator contends that the confirmation of his appointment at the 1923 session of the senate completed that appointment making it effective from its date; and he claims to have held under it at the time of his alleged removal and exclusion from the office. That appointment must be considered as one for a new term. It does not purport to have been made or intended to fill merely a vacancy, and we agree with respondent's contention that an appointment for that purpose would have added nothing to the force or effect of the relator's original appointment. Whether April 1, 1921, stated in the commission as the beginning of the new term would be the proper date instead of the date in February of the expiration of the previous term, assuming for the moment the validity of the appointment, need not be considered, since the point is not raised and is of no importance on this hearing. The dates of the beginning and ending of the successive terms of this office appear to have varied slightly, without any apparent suggestion of impropriety.

In view of the fact that the regular six year term, for the unexpired part whereof relator had been appointed, was to expire shortly after the adjournment of the legislative session of 1921, it would have been proper for a new appointment to be made and acted upon by the senate at

that session; and while it may have been the duty of the governor to send the name of an appointee to the senate at that session for its consideration, as stated in several of the cases on the subject, we do not doubt that there may exist substantial reasons for an occasional neglect of such duty without intending to ignore the senate or deprive it of its prerogative in the matter of appointments. And we understand that the withholding of the name of an appointee for this office from the senate session of 1921 is intended to be explained in the reply by the averment that in furtherance of the intention and policy of the Governor and the Legislature, it was understood that the relator should continue as engineer and be appointed the Wyoming member of a stated joint commission, to serve without compensation other than the salary to be provided for the engineer's office under a statute of that session increasing it. And we know that the statute increasing the salary was not finally passed until the last day of the session, February 19, nor approved until February 21. While that part of the reply is of no force, in our opinion, for the purpose of affirmatively establishing relator's right to the office, we think it not improper as an explanation of the reason for the delayed appointment, and to that extent only do we regard it as material. Nor would the governor's neglect to send a name to the senate during that session deprive him of the power thereafter to appoint in the manner provided by law; that is to say, if for a full or new term, with the confirming action of the Senate. State ex rel. v. Kuhl, 51 N. J. L. 191, 17 Atl. 102. It is contended for respondent in this connection that a full term appointment, if authorized at the time, could not become effective until confirmed, that the alleged confirmation was ineffectual because occurring after the expiration of the term of the governor making the appointment and after he had been succeeded in office by another, and for the reason also that the appointment was not communicated to the senate, nor consent or confirmation requested by the gov-

ernor. Replying to those contentions it is argued that the appointing and confirming acts need not be concurrent as to time, but that the latter may occur at any senate session following the date of the appointment; that the senate's confirming power may be exercised without executive request or communication; and that upon the expiration of a term the governor may appoint for a new term subject to the approving action of the confirming body, to relate back to the date of the appointment.

Those opposing contentions have been stated because, in part, they lead us into a field of inquiry where the decisions are comparatively few in number, and owing to that fact, as well as differences in constitutional and statutory provisions, they cannot, perhaps, be said to have developed a settled law on the subject. But in some respects the law may be said to be fairly well settled. It has been thought that an expression of the court in State v. Henderson, supra, referring to the action of the senate confirming Henderson's appointment may indicate a consideration in that case of one phase of the question. But we are satisfied that the court had in view only the particular facts of that case, and had reference only to an appointment not requiring but complete without confirmation. This is what the court said:

"It appears that the Senate did not act upon the nomination of Stone by Governor Osborne, possibly because it desired to have Henderson continue in the office. This is shown by the action of the Senate confirming him. This was ineffectual, as the appointment was not made to the Senate, but until the Legislature met. At that time, a new appointment was necessary and proper, as is conceded, but such appointment could then have been made only by Governor Osborne, by and with the advice and consent of the Senate."

Henderson's appointment was to fill a vacancy "until the next meeting of the Legislature." On the first day of the next meeting the senate adopted a resolution reciting the facts of that appointment and confirming it, and adjourned without acting upon an appointment of another person to the office by the succeeding governor. The court's above quoted statement we take to mean that the senate's action was ineffectual for the reason that the appointment was made *only* until the meeting of the Legislature, and for that reason also that the appointment was not made to the senate. We do not understand that it was intended to refer in any way to the fact that the appointment had not been *officialy communicated* to the senate; and under the circumstances there was no necessity for a decision as to that matter. The point decided was that when confirmation by the senate is not required, its action in the matter is of no effect, and that we believe to be the general rule. People v. Cazneau, 20 Cal. 506; Sewall v. Bennett, 187 Ky. 626, 220 S. W. 517.

The procedure under a provision for an official appointment by the governor with the advice and consent of the senate, or to be confirmed by the senate, is sometimes described or referred to as requiring "concurrent" action of the governor and senate. But it is evident that in most, if not all, of the instances where that expression is found in judicial decisions in the connection stated, the purpose is not to speak of the *time* when the governor and senate must respectively act but rather their cooperation or association in the same act. "Concurrent" is defined not only as "existing or happening at the same time," but also: "Acting in conjunction, agreeing in the same act or opinion; contributing to the same event or effect; cooperating." See "Concurrent;" Webster's New Int. Dict. And there would seem to be no propriety in the use of the word as descriptive of the acts essential to the validity of such an appointment, except to express merely the necessity of consent by the confirming body. Certainly the language

of the provision for appointing to the office here in question—"shall be appointed by the governor and confirmed by the senate," does not necessarily imply that the two acts must be concurrent in point of time. Indeed, consideration of a recess appointment by the senate at its next session is expressly provided for in several states by constitution or statute, evidencing that such separation of the required acts, in the matter of time, is not regarded as at all incongruous. See, State v. Williams, 20 S. C. 13; Stamps v. Tittle (Tex. Civ. App.) 167 S. W. 776; Sewall v. Bennett, supra. And the generally accepted rule seems to be that the two acts need not necessarily occur at the same time, though it may be conceded that, when required, the confirming act is essential to complete the appointment. It is held, therefore, that where an appointment subject to approval by the senate has been made during a senate recess, that body may act at its next session, at least when the appointment is communicated to the senate for its consideration by the governor. Shepherd v. Haralson, 16 La. Ann. 134; State v. Young, 137 La. 102, 68 So. 241; People v. Blanding, 63 Cal. 333; People v. Addison, 10 Cal. 1; Walsh v. People, 72 Colo. 406, 211 Pac. 646; State v. Williams, 222 Mo. 268, 121 S. W. 64, 17 Ann. Cas. 1006; Commonwealth v. Waller, 145 Pa. St. 235, 23 Atl. 382. See also, People v. Mizner, 7 Cal. 519.

In the cited Pennsylvania case, it appeared that the respondent had been appointed and commissioned and had qualified in the place of one who had died, and had assumed and continued in possession of the office until the hearing; that the Senate not being in session at the time of his appointment, the same governor, at the next session, occurring in January, 1891, nominated the respondent for confirmation for a term to date from the first day of March, 1890, the date when respondent had gone into office under the original appointment, and on January 20, 1891, the senate confirmed such appointment; but the succeed-

ing governor, who was inaugurated on the same day and prior to said confirmation, nominated another for the office, which nomination the senate rejected, and after the adjournment of the senate the governor assumed to appoint and commission the one who had been rejected for the full term of four years. The court held that the former governor's appointee having been confirmed was properly in office, and said: "The confirmation of respondent by the Senate necessarily extends his original appointment for the balance of the unexpired term."

We have already referred to the Missouri case of State v. Williams. The opinion in that states that the law contemplates that appointments shall be made at the proper time, and that the senate may act upon them at its next session. In the Colorado case, Walsh v. People, referred to in an earlier part of this opinion, it appeared that Walsh, the respondent, had been appointed by a former governor on May 10, 1918, for a term of four years from June 15, 1918, and confirmed on January 8, 1919, his name having been sent to the senate for confirmation. The court held that the term of the office could not exceed two years, but said:

"Although it is true that the appointment of May 10, 1918, must be regarded as an appointment 'to discharge the duties,' which we will call an appointment ad interim, and even though it had been expressly such, yet we see no reason why the Governor and Senate might not at 'the next meeting' of that body, if they chose, have regarded that interim, as a part of the term and have made the permanent appointment accordingly."

It is also held that a confirmation will relate back to the time of the nomination or appointment or when the appointee took possession of the office, as the case may require. Shepherd v. Heralson, supra; Dyer v. Bayne, 64 Md. 87. The Maryland constitution provided that officers

appointed by the governor and senate shall be nominated to the senate within 50 days from the commencement of each regular session, and that the term of office, except in cases otherwise provided for in the constitution, shall commence on the first Monday of May next ensuing the appointment, but the beginning of the term of the office involved in the case cited was fixed by law as the first Monday of March next following the appointment. A nomination for the office was sent to the senate within the required period of 50 days, but was not acted upon until April 5, when it was confirmed. Against the contention that the confirmation was too late to validate the appointment for that year and that the appointee could not take office until the first Monday in March of the succeeding year, the court said:

"The efficient and only discretionary act of the Governor in making the appointment, was in making the nomination; and the Senate having no other power over the nomination than to concur or non-concur in it, the act of the Governor became complete and effective with the concurrence of the Senate, and it related back to the time of the nomination. The act of the Senate, and the subsequent ministerial act of the Governor in issuing the commission, both related to the principal act of the Governor in making the nomination; the commission being evidence only of the appointment. And the appointment being thus allowed to speak as from the time of the principal act done in making it, all difficulty upon the terms of the Constitution is at once removed. There can be no good reason why the principle of relation should not be applied in a case like the present, as it is constantly applied in many others, for the advancement of justice, and to give full and complete effect to legal proceedings. We think it should be so applied."

That principle is recognized in Walsh v. People, and Commonwealth v. Waller, supra, and other cited cases sustaining a confirmation as effective from the date of a recess appointment, or the taking possession of the office thereunder. And the propriety of the senate acting upon recess appointments for full terms at its next session seems also to have been recognized in this state in the case of certain other appointments made by Governor Carey during the recess between the sessions of 1921 and 1923, which were confirmed upon the request of his successor in office. Several other appointments for full terms and one, at least, for an unexpired term of several years, but dating from the beginning of the term appear to have been made by Governor Carey soon after the adjournment of the legislature in 1921. And in several of such instances, upon the request of his successor in office, Governor Ross, the appointments were confirmed by the senate at its next session (1923) for terms beginning early in 1921.

The published Senate Journal of 1923 discloses that on February 7, a communication was received from the Governor, dated February 6, from which we quote:

"Governor Robert D. Carey having appointed Mr. Fred W. Geddes as a member of the Board of Trustees of the University of Wyoming for a period of six years, after the last session of the Legislature had adjourned, I hereby nominate Mr. Fred W. Geddes of Centennial, Wyoming, for a term of six years from February 23rd, 1921. I respectfully request your advice and consent to the same."

Other like communications of the same date were received, mentioning full six year term appointments by Governor Carey of Dean Prosser and J. A. Elliott, each as a member of the University Board. And each of the persons so named was confirmed for a term beginning February 23, 1921. (S. J. 1923, 225.) By another executive communication dated February 15, the Senate was in-

formed that on September 20, 1921, Governor Carey appointed A. E. Roedel as a member of the Board of Pharmacy for a term of six years from February 21, 1921, to fill out the unexpired term of W. P. Hays, who had resigned, and requesting consent to that appointment, and it was thereupon confirmed. (S. J. 1923, 363, 374.) And we understand said appointees had respectively occupied the offices named from approximately the date of the recess appointments respectively. We have no doubt that such request was deemed essential by Governor Ross, in each instance, to authorize the senate to act in the matter; yet the difference in time between the original appointment and confirmation was not regarded as an obstacle to the latter, and that is the point upon which the instances are cited.

This brings us to the contention that the confirmation was ineffective for the reason (1) that Governor Carey had been succeeded in office by Governor Ross, and (2) that the Senate acted without executive communication or request. As shown above, the senate on February 15, 1923, considered and confirmed certain appointments made by the former governor in 1921, for terms beginning in that year. That was in response to communications from the present governor. Two days later, the last day of that session, the senate proceeded to consider and confirm the relator's appointment. The proceedings concerning it are recorded in the Senate Journal as follows:

"The President brought the attention of the Senate to the following appointment of Governor Robert D. Carey, which, with the consent of the Senate, he instructed the Chief Clerk to read, the said appointment being as follows: (Here is copied the Commission appointing the relator, Emerson, for the term of six years from April 1, 1921, signed by Governor Carey, attested by the signature of the Secretary of State, and the Great Seal of the State). Mr. President: Mr. Lee: I move that the Senate resolve

itself into open Executive session. The motion carried. Executive session. The following appointment of Governor Robert D. Carey was read: (Commission again copied in full). Mr. President: Mr. Lee: I move that the Senate do now advise, consent and confirm the appointment of Frank C. Emerson as State Engineer for a term of six years from the first day of April, A. D. 1921.''

The Journal then shows a roll call on the motion, resulting in 17 affirmative votes, excused 3 and absent 5, and continues: ''Whereupon, President Skovgard declared the Senate had, by its vote, confirmed the appointment of Frank C. Emerson as State Engineer.''

It does not appear that Governor Ross sent any name to the senate for said office during said session. And there can be no question but that by its said action the senate did confirm the Emerson appointment for said full term, if it then had authority to act upon it.

While we understand what counsel means by the argument that the expiration of the term of the governor making the appointment, and the fact that he had been succeeded in office by another, deprived the senate of its confirming power as to that appointment, we do not understand upon what principle that argument can prevail. Neither of those facts was deemed an obstacle to the valid confirmation of the same governor's appointments in the other instances above mentioned. And those confirmed appointments are not, in our opinion, to be considered as made solely by the succeeding governor, but merely as recognized, consented to and adopted by him, and at his request confirmed. They could not be joint appointments. There is only one governor in office at any time; and there is always a governor under our laws, the constitution and statutes providing for a succession in the office to prevent an interregnum. We think it is not a valid argument that the senate by its action confirming relator's appointment confirmed an appointment made by a private citizen.

When the appointment was made, and for approximately a year and nine months thereafter, Governor Carey was governor, and his commission of the relator is attested by the Great Seal of the State attached thereto by its proper custodian, the Secretary of State, who, no doubt, kept a record thereof in his office as required by law. Comp. Stat. 1920, § 110.

As already indicated, we do not think the appointment became effective until confirmed, but, when properly confirmed for the term stated in the appointment, that act might relate back to the date when the relator assumed possession under the appointment if necessary to validate the appointment from that date and the senate expressly confirmed the appointment for the term beginning as stated in the governor's commission. If the appointment might legally have been withdrawn by Governor Carey during his term, or by Governor Ross after he succeeded to the office, and before confirmation, that was not done. Hence, at the time the senate acted, the appointment was on record as an executive act and was confirmed as such.

In the Pennsylvania case above cited, Commonwealth v. Waller, the confirmation is shown by the decision of the trial court published as a part of the report of the case, to have occurred *after* the inaugural of the new governor, though on the same day. The Supreme Court, in reversing that decision and sustaining the confirmation as extending the original appointment for the balance of the term, said nothing as to the time of the day that the senate acted, evidently deeming the fact immaterial whether its action was before or after the inaugural; and certainly the court regarded the action of the senate as confirming an appointment by the *governor*, notwithstanding that the individual who, as governor, had made the appointment and nomination had gone out of office. The Supreme Court of Kansas has recently said in Barrett v. Duff, 114 Kan. 220, 217 Pac. 918:

"The Supreme executive power of the state is vested in the governor. Const., Art. I, § 3. This executive power is continuous—never ending. It knows neither names nor persons. It began with the first governor, has continued ever since, and will continue unbroken so long as the Constitution exists."

And again, in State v. Mattasarin, 114 Kans. 244, 217 Pac. 930:

"The supreme executive power vested in the governor is a continuous one, and is to be exercised as the law provides by the one who happens to hold the office at the time of its exercise. Terms of office are not ended, nor is there any authority to revoke appointments because there has been a change or succession in the office of governor."

We shall have occasion presently to refer again to one of these Kansas cases, for it is directly in point upon the question of the necessity of an executive communication submitting an appointment to the senate to authorize that body to act. Our constitution and statutes contain twenty-five or more separate provisions for official appointments by the governor with the consent of or to be confirmed by the senate, and the word "nominate" is used in only four of those provisions, if we are correct in the result of a rather hasty examination. Those occasional cases are: the State Veterinarian, the Board of Live Stock Commissioners, the Board of Pharmacy Commissioners, and the University Trustees, and they are found in the statutes; those relating to the Veterinarian and the Live Stock Commissioners having been originally enacted while Wyoming was under a territorial form of government and the procedure for submitting federal appointments to the United States Senate would naturally be followed. And it may be doubtful whether the statutory requirement that the governor "nominate" members of the University

Board may be controlling, since the constitution declares only that they shall be "appointed" by the governor with the consent of the senate. The usual provision in the statutes for appointments by the governor is that he shall appoint by and with the advice and consent of the senate; and a provision in those words is found in the Constitution for the appointment of the State Geologist and Inspector of Mines. But the words employed in that instrument providing for the selection of the State Examiner and State Engineer are, in each case, that he shall be appointed by the governor and "confirmed by the senate."

Notwithstanding the very infrequent use in our statutes of the word "nominate" when directing an appointment by the governor, with the consent of or to be confirmed by the senate, a reference to the published legislative journals coming under our observation has disclosed the fact that the several governors for at least twenty years have been in the habit of using a form of communication stating that the governor nominates for the described office and term, and requesting the consent or confirmation of the senate. That custom has no doubt resulted from using as a model the phraseology of presidential communications to the Senate of the United States submitting official nominations to that body. The use of the word in the case of federal appointments is proper to comply with the provision of the Constitution of the United States providing that the President shall "nominate" and by and with the advice and consent of the senate shall appoint. Said executive custom in this state, however, is not sufficiently potent, in our opinion, to require or justify the court, in determining the right of the senate to exercise its confirming or rejecting power in the absence of executive communication, to consider the meaning or effect of the word "nominate" or a provision that the governor shall nominate, where a nomination is not required for the particular office in question. Nor, except in the very few in-

stances in our statutes providing that the governor shall nominate, do they contain anything restricting the authority of the senate in the exercise of its said power to cases where its action has been directly invited by a communication from the governor, unless such restriction is to be implied from the fact that its power is to advise and consent to or confirm or to refuse to consent or confirm. And that we think presents a very important question and one upon which the authorities directly in point are few. They support, however, the contention that the senate may act upon an appointment where such action is provided for by law,· although the appointment has not been communicated to it by the executive or through his office.

The orderly and contemplated method is of course an executive communication placing the matter before the senate for its consideration; and that is the method usually employed here and elsewhere. We suppose also that upon a reasonable anticipation of a necessity therefor the senate might request by resolution the submission to it of recess appointments which when so submitted it would be authorized to consider under its said power. But why may not the senate act upon an appointment of which it has knowledge, if the governor should refuse or neglect to ask for such action especially where the appointee is known to have entered upon the duties of the office? A provision for an appointment by the governor with the consent of or to be confirmed by the senate directs not only what *shall* be done, but also in effect, what *shall not* be done. The affirmative act of the two governmental agencies is required to confer title to an office under such a provision. A completed appointment cannot be made in any other way than as so provided. People v. O'Toole, 164 Ill. 344, 45 N. E. 683; Clark v. State, 177 Ala. 188, 59 So. 259. While the governor's act in selecting the person to be considered for an office may be the principal and perhaps the more important one of the two, it is not alone sufficient. A construction of such provision denying the right of the

senate to act in any case unless directly requested to do
so by the governor or by a communication from his office
would obviously give him the power to ignore the co-ordi-
nate right of the senate, and might mean the abolition of
that right and certainly would make it entirely dependent
upon the governor's pleasure. The probability of that ef-
fect would be more marked, perhaps, where a recess ap-
pointment for a fixed term is held to be effective until re-
jected by the senate, but under the rule adopted in this
state, and to which we adhere, that confirmation when
required is necessary to complete an appointment, the
same result would not be impossible. Indeed, we think
the point may be illustrated by the facts in this case,
showing two appointments to the same office, each for a
full term of six years extending beyond the term of the
governor making it, neither of which has been submitted
by executive communication to the senate. If allowed to
stand, said second appointment might of course be sub-
mitted at the next session of the senate. But if not so
submitted, would not the effect above suggested follow
from a decision that the senate would then be powerless
to act? It is usually held that the senate, in the exercise
of its power to consent to or confirm executive appoint-
ments, performs an executive or administrative rather
than a legislative function. Herman v. Harwood, 58 Md.
1; and see Op. of Justices, 72 Me. 542.

In Sewall v. Bennett, 187 Ky. 626, 220 S. W. 517, cited
above on another point, the senate adopted a resolution
rejecting certain recess appointments by a former gover-
nor and confirming new appointments for the same posi-
tions by the governor then in office; and that action was
sustained. That case, aside from the statement of certain
principles, is important upon the question here to the ex-
tent only that it shows a consideration of and rejection of
recess appointments without their having been submitted
to the senate by executive communication. And there was

apparently no suggestion in the case that such action was improper.  Governor Morrow, who had succeeded Governor Stanley, informed the senate that, subject to its consent, he had appointed certain named officers.  We quote from that case a part of the senate resolution:

"The Governor having informed the senate that he has, subject to the consent and approval of the Senate, appointed   *   *   *   and having asked that the senate take appropriate action upon said appointments;   *   *   *   Be it resolved, that all vacation appointments to said board *   *   *   by Governor A. O. Stanley be, and the same are, by the Senate hereby rejected, and the appointment of said (naming three appointees)   *   *   *   this day submitted by Governor Edwin P. Morrow to the Senate for its approval, be, and the same is, hereby consented to and approved by the Senate."

Governor Stanley's appointees contended that their appointments were valid and complete without confirmation.  The court held against them, upon a consideration of the several provisions of the statute affecting the matter, and a greater part of the opinion is taken up with a consideration of that matter.  But, concluding the opinion, the court said in substance: That the governor, unless the statute creating the office otherwise provides, must submit the appointments to the senate at its first session after making the appointments, and that no person whose appointment is not approved by or is rejected by the senate is entitled to hold the office after another person appointed thereto by the governor has been approved by the senate.  We find nothing in the opinion to indicate that the senate was deemed to be without authority to consider and reject such appointments, though not directly submitted for its action by the executive.

The above cited Kansas case of Barrett v. Duff, decided in July of the present year, but not published until after

the submission of the case at bar, presented a situation somewhat similar to that in this case. The appointments were made during a recess of the legislature following its session of 1921, as we understand, for fixed terms to expire on specified dates in 1925; and the governor making them was thereafter succeeded in office by another, presumably before the next legislative session. Said appointments were not communicated to the senate at that next session, but, without any such communication, they were severally acted upon and confirmed at that session. In that case, it appeared also that the succeeding governor had transmitted to the senate the names of other persons for the same offices, with the information that he had revoked and cancelled the aforesaid appointments of his predecessor. The procedure of the senate respecting said appointments is stated in the opinion in substance as follows:

That the legislature having convened on January 9, 1923, the senate in regular session on January 16 adopted a motion to consider recess appointments. The aforesaid recess appointments were then referred to a senate committee. On specified dates thereafter from February 21, 1923 to and including March 16, 1923, the new governor transmitted to the senate the names respectively of his appointees in place of Governor Allen's appointees. Said appointees of Governor Allen had each entered upon the discharge of his duties at or about the time of his appointment. On March 7 the senate, in executive session, confirmed the said appointments of Governor Allen and for the terms for which they had respectively been made. Governor Allen's successor, Governor Davis, also issued papers "in form and with intent" to commission the persons respectively whose names he had sent to the senate.

The same contention was made there as here, that a confirmation to be effective must be in response to a communication by the executive directly to the senate. The

court considers that contention at some length, and refers to the fact that the statutes do not provide for a nomination by the governor preceding the senate action, but that his privilege and duty is to appoint by and with the advice and consent of the senate, thereby differing from the provision of the federal Constitution regulating federal appointments. And the power of the senate to act under the conditions stated is further discussed as follows:

"The Senate, on January 16, 1923, entered upon the consideration of the names of defendants as appointees to their respective offices. This procedure was usual and customary. The only element lacking in the consideration of such recess appointments was the fact that the Governor, in this instance, failed to transmit the names of the defendants as having been appointed. The Senate, after due consideration, confirmed the appointments of the defendants, which was, in effect, a rejection of the appointees of Gov. Davis, the plaintiffs herein. The plaintiffs deny any force or validity to the action of the Senate. * * * because of the failure of the executive to directly transmit the names of defendants. No good reason is advanced why the Senate would not consider such recess appointments without such direct word from the executive. * * * The offices in controversy are all located in the capitol building, in which the senate holds its deliberations. They are important departments of the state government. The Senate may, and often does, have official business with them. It receives reports from them. It considers the service which the departments are, by law, required to perform. It considers the extent of such service and its requirements. It considers and passes appropriations in order that they may lawfully and properly function. Under all the circumstances, the senate cannot shut its eyes to the facts as to whether the respective offices are filled; whether they are functioning under the law, or whether there is a vacancy therein. * * * The

Senate, which has official knowledge of all of the acts of
another state department, may not close its eyes to an
existing fact merely because the executive has failed to
transmit a communication giving it the advice.  *  *  *
The Senate must be permitted to investigate on its own
initiative, and without communication from the Governor,
the status of offices; otherwise the Governor could fill and
refill them at his pleasure by simply failing to advise the
Senate.  *  *  *  The investigation by the Senate brought
before it the records of the secretary of state showing the
appointments of the defendants.  We conclude that the
Senate did not go beyond its powers in making the inves-
tigation concerning the offices held by the defendants, and,
having satisfied itself, that it could properly exercise its
judgment thereon.  While it is the usual and customary
courtesy of the executive to transmit such facts to the
Senate, we believe it the better view to hold that the Sen-
ate may, on its own initiative, if it so desires, ascertain
the facts upon which to base its deliberate and final judg-
ment in confirming or rejecting appointees of the Gov-
ernor.''

There were three appointments and three cases disposed
of in the one opinion.  Five of the justices joined in the
opinion.  The other two concurred in the result as to one
of the cases, which involved a vacancy appointment, and
dissented as to the others.  One of them wrote a dissenting
opinion, in which it was said upon the question now under
consideration that the defendants' rights were not
strengthened by the senate's procedure; that no authority
was cited in support of that procedure; and that where
the statute requires an appointment to be made by the
concurrent action of the executive and a confirmatory
body, such concurrent action cannot be established by
showing that one of them consented to something which
the other did not want to do.  That is substantially the
argument made here by respondent's counsel, based upon

the fact that the governor who made the appointment went out of office before it was confirmed. We think the fallacy in it is to be found in the implication that the governor did not want what the senate consented to, for it assumes what we believe to be erroneous, that because the appointments were made by one who had since retired from office, they had ceased to be executive acts, or to express the executive will.

The appointment here was made by one who was governor when it was made, and while he remained governor his appointee acted under it, though remaining in possession as his own successor. And so far as we are advised, the appointment and possession of the office was acquiesced in by the other officials of the executive department of the state government; and we assume the appointment to have been a matter of record in the office of the secretary of state, as required by law. The matter of an official appointment is not personal. The right to make it does not attach to the person but to the official upon whom that right is conferred. The appointment of relator, whether valid or not, was an official act, and by no progress of time or change in the succession to the governor's office could it be changed from an official to a private or personal act. The Pennsylvania case of Commonwealth v. Waller is fairly in point on this, for, in that case, it appeared that the only communication the senate had at the time of its action was from one who had been succeeded by another. It is certainly in point as against the proposition that a confirmation of the appointment of a governor who prior thereto had gone out of office is a consent to an act which the governor did not want, based upon the fact that the new governor may not have desired such confirmation.

The provision as to the office here in question found in the Constitution does not say that the appointment made by the governor shall be confirmed by the senate when

requested by the former, or upon a communication by him submitting the matter to the Senate. And we perceive no substantial reason for adding by construction any such restriction upon the senate's right to act. We have no doubt that to maintain the orderly procedure above mentioned and to avoid friction in the administration of the affairs of the state government concerning the matter under consideration, the senate should not act hastily or without the appearance of some reasonable ground; nor should it endeavor by first proposing any such action to impose its will upon the executive. Each of these public agencies should be left free to act in the manner intended by the provisions granting the power. It appears, however, in this case, that the senate did not act until the last day of its session, when, no doubt, it was well understood that the said appointment would not be sent to it for consideration.

The fact of this appointment could not have been otherwise than well known to the senate. We need not specify the apparent reasons for such knowledge except to say that the office is an important one and its quarters are on the same floor as the Senate Chamber in the Capitol Building, and, as alleged, the appointment had been delayed to carry out a stated policy and purpose of the governor and legislature.

Another case, Larsen v. City of St. Paul, 83 Minn. 473, 86 N. W. 459, is somewhat in point on this question. It involved the right to the office of Police Sergeant by one appointed by the Mayor. Although an appointment to the office required the consent of the common council of the city, it seems to have been the fact that its consent was not asked. At least it appears that the council had never acted upon the appointment by direct vote. It was held that said appointee having entered upon the discharge of the duties of the office, his name having appeared as Sergeant on the monthly payrolls submitted to and approved

by the council for more than seven years, and through its approval payments were made to him during that period, the council by those acts had given its consent to the appointment.

There was no actual change in the possession of the office when the relator, as alleged, assumed to act under the 1921 appointment, for he was then in possession under the previous appointment. The only change, if any, was in the title under which possession was retained. Had another person been the vacancy appointee and continued to hold under it, we do not think he could have been legally compelled to surrender possession to the relator until the latter could show that he had been duly appointed and confirmed for a full term. But if, in that case, possession had been voluntarily surrendered to him, the relator would have been at least a *de facto* officer until confirmed, and then such officer *de jure* relating back to the date of his possession. Upon the facts here, however, during said interim he was not only *de facto* but *de jure* the State Engineer, for he was entitled to hold under his vacancy appointment until the due appointment and qualification of a successor.

But whatever the title under which the relator was properly holding the office, the question arises upon the pleadings whether or not he was lawfully deprived of his right thereto by the alleged removal proceeding. It is conceded that the governor acted in that matter under the provisions of Section 318, Comp. Stat. 1920, originally enacted in 1905 (L. 1905, Ch. 59, Sec. 1), reading as follows:

"Any officer or commissioner of the state of Wyoming who shall hold his office or commission by virtue of appointment thereto by the governor, or by the governor by and with the advice and consent of the senate, may be removed by the governor from such office or commission for maladministration in office, breech of good behavior, wilful neglect of duty, extortion, habitual drunkenness, or any other cause deemed sufficient by the governor to justify and war-

rant such removal; Provided, Reason for such removal shall
be filed in the office of the secretary of state in writing, sub-
ject to inspection by any person interested.''

The validity of the removal is challenged, first, on the
ground that the State Engineer is removable only by im-
peachment under the provisions of Sections 18 and 19, Art.
III of the Constitution, viz:

''Sec. 18. The governor and other state and judicial of-
ficers except justices of the peace, shall be liable to impeach-
ment for high crimes and misdemeanors, or malfeasance in
office, but judgment in such cases shall only extend to re-
moval from office and disqualification to hold any office of
honor, trust or profit under the laws of the state. The party,
whether convicted or acquitted, shall, nevertheless, be liable
to prosecution, trial, judgment and punishment according
to law.''

''Sec. 19. All officers not liable to impeachment shall be
subject to removal for misconduct or malfeasance in office,
in such manner as may be provided by law.''

The same contention was made in this court as to the of-
fice of superintendent of a water division of the state, and
it was held that said office, although mentioned in the con-
stitution by a provision directing the legislature to provide
for the appointment of superintendents of water divisions,
and also when describing the constituent members of the
Board of Control, (Art. VIII, Secs. 2, 4), did not come
within the meaning of ''other state'' officers declared to be
liable to impeachment but that the incumbent was subject
to removal under section 19 of the Constitution and the stat-
ute aforesaid. State ex rel Hamilton v. Grant, 14 Wyo. 41,
81 Pac. 795, 82 Pac. 2, 1 L. R. A. (NS) 588, 116 Am. St.
Rep. 982. The court said:

''It will be observed that the causes for impeachment are,
'For high crimes and misdemeanors, or malfeasance in of-

fice,' including only criminal conduct or positive wrongdoing, while officers not liable to impeachment may be removed for 'misconduct or malfeasance in office,' thus very greatly extending the causes for removal authorized to be provided for by law. We are very clearly of the opinion that it was not the intention of the framers of our Constitution to require that the jurisdiction of the high court of impeachment should be invoked to try and remove minor and subordinate officers, especially as the term of office of many of such officers would expire by limitation during the session of the Legislature at which they could be impeached, and, again, that court would have no jurisdiction in cases of 'misconduct' not amounting to a high crime or misdemeanor, or malfeasance in office. We are strongly inclined to the opinion, without deciding the point, that the officers liable to impeachment are the Governor and other state officers mentioned in Section II, Article 4, of the Constitution, which does not include the office in question. Certainly, and it has generally been so considered, that only the superior executive and judicial officers of a state are subject to impeachment, and we have found no case where an officer holding by appointment, or an inferior office of any kind, has been held subject to impeachment. On the other hand, it has been held that such officers are not so subject. (15 A. & E. Enc. (2nd Ed.), p. 1065; State ex rel. Hitchcock v. Smith, 6 Wash. 496 (33 Pac. 974) ; State ex rel McGreavy Hewitt, 3 S. D. 187 ; State ex rel. Stearns v. Burke, 8 Wash. 412 (36 Pac. 281).''

And the court quoted from the cited South Dakota case a remark to the effect that the language in the constitution of that state defining what officers shall be liable to impeachment did not include officers appointed by the governor; said language being like that employed in our Section 18, aforesaid, and even more inclusive, for ''all'' other state officers were the words there used following the mention of the office of governor.

The Hamilton case has since been cited with approval in McDowell v. Burnett, 92 So. Car. 469, 75 S. E. 873, where the right of the governor to remove a magistrate whose appointment had been confirmed by the senate was involved; and the court said, preceding that citation:

"The use of such general terms as 'all executive and judicial officers,' 'all civil officers' and the like in the impeachment articles of constitutions, where they must have been meant to have some limited meaning, is one of the most curious anomalies of legislation. However difficult the task, the Court must try to find the line of distinction which the convention probably had in mind and mark that as the true line. * * * Search for the line of distinction * * *, in the light of the history of the subject in this State and of judicial authority in this country, leads to this conclusion: Every executive and judicial officer whose authority and jurisdiction extends over the entire state—in whose official conduct the entire state is concerned—and whose office was created by the Constitution, or created by statute and filled by election by the people at large, is removable by impeachment or by the Governor on the address of the General Assembly or by conviction of embezzlement or of appropriation of trust funds and in these modes only. * * * The few precedents on the subject indicate preplexity of the Courts, but they also indicate approval of the line between impeachable and nonimpeachable officers which we have stated."

The Justices of the Supreme Judicial Court of Massachusetts, in an opinion to the House of Representatives. on this subject, said that it was necessary to determine whether county commissioners came within the description of "officers of the Commonwealth;" that there were several classes of civil officers within the commonwealth; for example, town or city officers, county officers, district officers, and state officers; and that in a certain sense, all might be deemed to be officers of the commonwealth, and that the

view that all are subject to impeachment might accordingly be possible. But that the impeachment provision was not intended to include all civil officers of every grade; and they held that officers liable to impeachment were those "elected by the people at large, or provided for in the Constitution for the administration of matters of general or state concern," concluding by stating: "Considering the nature and character of the proceedings by impeachment, it does not seem wise to extend their scope by a doubtful constitution." Op. of Justices, 167 Mass. 599, 46 N. E.-118.

Learned writers upon the subject of removal of public officers by impeachment appear to have differed as to the precise nature of the proceeding, and the necessary ground therefor. In an article by Professor Theo W. Dwight, first prepared as a lecture to the students of the Columbia College Law School, published in 1867 in volume 6 (N. S.) American Law Register, pages 257-283, it is said that impeachments, like indictments, are methods of procedure in criminal cases, and that the person impeached can only be convicted of a crime known to the law; and that since there are no crimes against the United States which are not statutory, an officer of the United States would not be liable to impeachment except for a crime committed against the statutory law. The contrary view was taken by Judge William Lawrence of Ohio in an article published in the same year and in the same volume of the American Law Register, pages 641-680, who declared that impeachment was not a mode of criminal procedure and the grounds therefor were not limited either to crimes defined by statute or recognized at common law; and he concluded his discussion by saying:

"The result is, that an impeachable high crime or misdemeanor is one in its nature or consequences subversive of some fundamental or essential principle of government or highly prejudicial to the public interest, and this may consist of a violation of the Constitution, of law, of an official oath, or of duty, by an act committed or omitted, or, with-

out violating a positive law, by the abuse of discretionary powers from improper motives or (for) an improper purpose.''

In a later article on the subject by G. Willett Van Nest, (1882) (16 Amer. Law. Review, 798-817) it is stated as that writer's opinion that impeachment is a criminal trial and that a true crime must be charged, but he disagreed with the doctrine that under the constitution of the United States impeachment would lie only for a statutory crime. He said in the concluding paragraph:

''It is only required to be shown that an act has been committed which comes within the definition of a crime; and it frequently occurs that acts of public officers constitute crimes, which, if committed by private individuals would be adjudged harmless. * * * Whether a crime does or does not appear can be determined to some extent by the decisions of the Senate in case of impeachment, but it is generally to be decided by common-law rulings in similar cases; and in new cases we must frequently be guided by definitions furnished us by writers on the common law as a result of a close study of the cases decided in the common law courts.''

In a note the word ''crime'' is said to be used, not in a technical sense, but as meaning a criminal act, the chief element of which is the evil, as distinguished from the virtuous intention.

In view of the serious nature of an impeachment proceeding; and the tendency of the courts to limit the operation of general terms in constitutions defining its scope, so as to exclude therefrom all minor and subordinate officers, even though they might come strictly within the terms so employed, it seems clear that the term ''other state officers,'' as found in our constitution providing for such proceeding should not be construed as including or intended to include every officer who, for other purposes, might properly be

classed as a state officer. The words are used in connection with the office of Governor, and may, for that reason, as well as the reason above suggested, be limited to officers of a grade that might properly be included with that of governor, to accomplish the purpose of the provision. There must be some line of distinction; and we are disposed to leave the question where it was left in the case of State v. Grant, supra; leaving the court still inclined to the opinion, under the existing relevant constitutional and statutory provisions, that the officers declared liable to impeachment, aside from judicial officers, are the Governor and the other elective state officers mentioned in section eleven (11) of Article IV of the constitution; such other officers so mentioned being the Secretary of State, the Auditor, the Treasurer, and the Superintendent of Public Instruction. Those officers, with the Governor, are the only elective state officers, aside from certain judicial officers, and each is elected by the people at large for a term of four years. They constitute the principal and essential state officers. They are provided for in the Article of the Constitution entitled "Executive Department." And the only other office mentioned in that Article is that of State Examiner, (Sec. 14), which is directed to be provided for by the legislature as an appointive office; thus distinguishing it from the others by the manner of selection, and tending, we think, to indicate a distinction in the minds of the framers of the constitution when providing for or mentioning the few other state officers especially named in that instrument, which may be considered for the purpose, at least, of determining what officers are therein declared liable to impeachment.

Whether that provision might be extended by construction to any other state officer hereafter made elective by statute need not be and is not considered. No other has, up to this time, been made elective, and the matter might, perhaps, be expressly provided for by the statute creating the office or making it elective. Several appointive state officers have been provided for in addition to those mentioned

in the constitution, and for various terms, usually two or four years. Among them may be mentioned in this connection, the commissioner of public lands, upon whom has been imposed the duties concerning state lands originally discharged by the superintendent of public instruction, as provided by statute; the state board of equalization, composed of three members, taking the place of the board originally provided for in the constitution to be composed of the Auditor, Treasurer and Secretary of State; and said present board constitutes also the public utilities commission, named in the statute as the "public service commission;" and the insurance commissioner, upon whom is imposed duties originally imposed upon the state auditor. These are all important offices, proper, we think, to be classed with the appointive state offices provided for in the Constitution. And the fact that one such office with a specifically designated field of duty is named in the constitution is not alone sufficient, in our opinion, to justify the court in holding the provision for impeachment applicable to it. The safer and more reasonable construction we think is that such provision, exclusive of judicial officers, includes only, under existing conditions, the elective state offices aforesaid.

The removal proceeding is challenged also on the ground that the removal statute aforesaid, in so far as it may authorize a removal for other than misconduct or malfeasance in office (the causes stated in Sec. 19 of Art. III of the constitution) is void, if applicable at all to the office here in question created by the constitution with a fixed term. And we think that contention must be sustained, though perhaps the proposition might better be stated in a different form, viz: that the legislature is without power as to this office, so created by the constitution, to add to the causes for removal therein specified. 29 Cyc. 1410; 22 R. C. L. 561; 23 Ency. L. 2nd Ed. 431; Cooley's Const. Lim. 64; Commonwealth v. Williams, 79 Ky. 42, 42 Am. Rep. 204; Lowe v. Commonwealth, 3 Metc. (Ky.) 237; State ex rel v. Mc-

Neeley, 24 La. Ann. 19; Dawson v. Phillips, 78 W. Va. 14, 88 S. E. 456; Mechem on Public Officers, Sec. 457; People ex rel v. Howland, 155 N. Y. 270, 49 N. E. 775, 41 L. R. A. 838.

It is said in Dawson v. Phillips, supra:

"If it could be said that any of the causes specified in the statute are not included within either of the several classes specified in the constitution,   *   *   *   the statute would not be thereby rendered wholly void, but void only to the extent that it impinges upon the constitution."

The court said in the earlier case of Lowe v. Commonwealth, supra:

"It seems to us that there can be but one view of this question, which is, that wherever the constitution has created an office and fixed its term, and has also declared upon what grounds and in what mode an incumbent of such office may be removed before the expiration of his term, it is beyond the power of the legislature to remove such officer or suspend him from office for any reason or in any other mode than the Constitution itself has furnished."

Judge Cooley, in his work above cited, said:

"Another rule of construction is, that when the constitution defines the circumstances under which a right may be exercised or a penalty imposed, the specification is an implied prohibition against legislative interference, to add to the condition, or to extend the penalty to other causes."

And Mechem says, in his work above cited:

"Where no constitutional provision interferes, it must rest with the legislature to determine what causes shall be sufficient to warrant a removal, but where the constitution provides that officers may be removed for a given cause, de-

fining it in terms which have a definite and well-understood legal meaning, it is not competent for the legislature to extend its scope by adding or incorporating offences which do not fall within that meaning. The statement of one cause is an implied prohibition to the legislature's adding to it or extending it to other causes.''

The cases holding that a mere statutory office,—one created solely by the legislature, is within legislative control, and may be abolished, or the incumbent made removable in manner declared by the legislature, also, in effect, sustain the rule above stated as to an office created by the constitution. See: People v. Lippincott, 67 Ill. 333; Taft v. Adams, 69 Mass. (3 Gray) 126; State v. Douglas, 26 Wis. 428; 7 Am. Rep. 87, State v. Prater, (N. D.) 189 N. W. 334. It is said in Taft v. Adams:

''Where an office is created by law, and one not contemplated, nor its tenure declared by the constitution, but created by law solely for the public benefit, it may be regulated, limited, enlarged or terminated by law, as public exigency or policy may require.''

In State v. Douglas, the court say:
''It is readily conceded that in a case of a constitutional office, the tenure of which is prescribed by that instrument, the legislature cannot abridge the term thereof   *   *   *. But in respect to an office created entirely by an act of the legislature, the case is different.''

And in State v. Prater:

''This legislative power of removal concerning a public office *created by statute* (Italics ours) is not subject to the restrictions of the constitutional provisions concerning the removal of certain officers of impeachment or other officers upon stated grounds.''

The controlling constitutional provision, quoted above when discussing the matter of impeachment, is that all officers not liable to impeachment shall be subject to removal in such manner as may be provided by law "for misconduct or malfeasance in office." The legislature may provide by law the method and manner of removal under that provision, but it may not add a cause not comprehended within the meaning of misconduct or malfeasance in office. We understand counsel for respondent to have proceeded in their argument upon a different theory, for much emphasis was placed upon the provision of the statute authorizing removal for "any other cause deemed sufficient by the governor." Some of the causes stated in the statute would no doubt constitute either misconduct or malfeasance in office and to that extent the statute is applicable to the office in question, rendering also applicable, to the same extent, the method of removal provided by the statute. But it might be questionable whether such prescribed procedure would apply as to the office here in question with respect to a cause or reason for removal not falling within the meaning of the causes specified as aforesaid in the constitution.

The method provided by the statute is merely that the reason for the removal shall be filed in the office of the Secretary of State in writing, subject to inspection by any person interested. That was held to be a sufficient procedure in State ex rel Hamilton v. Grant, supra, the court saying:

"To our minds the language of the proviso is inconsistent with the idea of a hearing. The sole restraint upon the action of the Governor is the filing of his reasons for the removal, and the consequent check of public opinion.    *    *    * Being vested with the power to appoint many subordinate officers for whose conduct he is, in a measure at least, held responsible to the people, it was no doubt deemed wise by the Legislature to also invest him with the power of summary removal of such appointive officers for misconduct in office, whatever might be the source of his information and

knowledge of such misconduct, so long as in his judgment it existed; and that the filing of his reasons was a sufficient guaranty of his good faith, and that the power would not be abused, but would be exercised only when a faithful execution of the laws required it.   *   *   *   The law can be repealed if proven to be vicious. Its wisdom does not concern us, for our duty is simply to declare the law as we find it to be.''

That case was decided in 1905, shortly after the statute was enacted, and the statute has not been repealed, nor, so far as we are advised, has there been any attempt to repeal or change it in any patricular. We shall accept the case, therefore, as ruling this case upon the question so decided. The court, in that case, however, added to the quoted statement the following:

''There is no claim advanced by counsel for the relator that the reasons assigned by the Governor are not such as, if true, would constitute maladministration or misconduct in office, and they seem to us to be well within those terms.''

Thus it seems that the court then deemed it necessary to the validity of the removal proceeding that the reasons assigned shall be such as to constitute misconduct or malfeasance in office. And, upon a careful consideration of the question in this case, the court is now of that opinion. Indeed, it is conceded that the court may inquire into the facts of the removal to determine whether the governor has kept within his jurisdiction and, therefore, whether the cause assigned is one for which the removal is authorized by law. And we agree with the respondent's contention that judicial cognizance of the governor's action does not reach beyond the jurisdictional inquiry. But that the court may go that far, where the removal is authorized only for cause or for causes specified in the constitution or statutes, is, we think, well settled; at least that is the prevailing rule, and we think more reasonable than a rule denying the right

of judicial inquiry or review in such cases. That is to say, the court may inquire into the existence of the jurisdictional facts, among which are, ''whether the charges upon which the removing power acted were legal cause for removal, or whether the cause was sufficiently specified.'' 22 R. C. L. 574; 29 Cyc. 1410; 23 Ency. Law (2nd Ed.), 429; Mechem on Pub. Off. Sec. 456; Throop on Pub. Off., Secs. 392-398; Village of Kendrick v. Nelson, 13 Ida. 244, 89 Pac. 755; 12 Ann. Cas. 993; State v. Hawkins, 44 O. St. 98; 5 N. E. 228; State v. Hay, 45 Neb. 321; 63 N. W. 821; State v. Frazier, 47 N. D. 314, 182 N. W. 545. The court say, in Ekern v. McGovern, 154 Wis. 157; 142 N. W. 595, 46 L. R. A. (N. S.) 796:

''An officer exercising such power, * * * acts in a *quasi-judicial* capacity, the matter of procedure must be of a *quasi-judicial* character, and as the officer is an inferior tribunal, as such he must be amenable to the court when acting in excess of the jurisdiction conferred. * * * Neither this nor any of the numerous authorities go further than to hold that excess of jurisdiction is jurisdictional. Whether the governor, exercising the power of removal, acquired jurisdiction to act and proceeded to a finality without excess of jurisdiction, may be inquired into whenever the result is called in question collaterally or directly.''

In a note to State ex rel Kinsella v. Eberhart, 39 L. R. A. (N. S.) 788, it is said:

''But it seems that the courts will look into the question of a governor's power and jurisdiction, and to the legality or existence of the ground assigned by the governor.''

In the cited Idaho case, it was held, quoting from the syllabus by the court:

''Where a statute provides that an officer may be removed for certain specified causes, the order of removal must be based and founded upon some one or all of such causes, and cannot be made for other causes.''

The relator challenges the validity of the alleged removal proceeding on the further ground that the reasons assigned by the governor for the removal do not constitute either misconduct or malfeasance in office. The cause assigned was the commission of a flagrant breach of good behavior detrimental to the public service, and an act of insubordination, by causing or allowing his commission as State Engineer, issued to him in 1921, to be presented to the senate for confirmation without consulting the governor and without the latter's knowledge. Since the validity of the removal must depend upon the sufficiency of the cause or reasons assigned to vest jurisdiction in the governor, we shall quote the entire statement of the reasons filed with the Secretary of State, omitting only the address and signature, but stating that it was addressed to the Secretary of State by name and title, and signed by the governor. It was dated March 13, 1923, and reads:

"Under and by virtue of the authority vested in the Governor of the State of Wyoming by Section 318, Wyoming Compiled Statutes of 1920, I hereby remove Frank C. Emerson from the office of State Engineer.

This action is taken because, contrary to the dignity of the office to which he was appointed after the adjournment of the Sixteenth State Legislature and in violation of the comity which should exist between any appointive state officers and the chief executive, in whom is vested the appointive power, Mr. Frank C. Emerson participated in and attempted an usurpation of the functions of the Governor by allowing an *ad interim* commission as State Engineer, issued to him in 1921 by my predecessor after the adjournment of the Sixteenth State Legislature, to be presented to the Senate of the Seventeenth State Legislature for confirmation without the consent or knowledge of the Governor.

Without the Governor having submitted any communication whatsoever to the Senate requesting the confirmation of his appointment as State Engineer, he, without consult-

ing the Governor and without the Governor's knowledge, allowed to be submitted to the Senate at three o'clock in the morning his commission for confirmation. Such an act on his part was extraordinary and unprecedented and subversive of all orderly procedure, and constituted a flagrant breach of good behavior which was detrimental to the public service. If tolerated by the executive it would establish a precedent that would tend to destroy the efficiency of the government and would place a premium upon gross insubordination, and lead other appointive officers in the future when moved by the desire to retain office regardless of the wishes of the appointive power to follow his example, not only by exceeding their own authority and attempting to force the hand of the Governor, but by boldly presuming as he has done to exercise the power of the Governor to communicate executive appointments to the Senate.

By his failure to observe the proper respect that is due to the office of Governor he has destroyed his usefulness as a public officer and made it wholly impossible for him and the executive to work in harmony. Such action as that of which he is guilty cannot be safely tolerated."

The above is from a certified copy from the office of the Secretary of State furnished us upon the hearing by respondent's counsel, and differs in some particulars from the communication set out in the answer, alleged to have been addressed to the relator and filed with the Secretary of State, but which, it seems, was merely sent to relator. That document uses the personal pronoun "you" in place of relator's name in the statement filed with the Secretary of State, and contains matter not in the statement filed with the Secretary of State, including the following in its closing paragraph:

"The services which you have rendered the State in the capacity of State Engineer have not been ignored by me, and it may not be amiss to say, indeed, that requests for

your appointment emanating from yourself and your friends were not without their weight with me, but these facts serve only to render your offense the more serious. The affront which you have offered leaves me no course but to take this action of removing you."

It seems necessary at this point to inquire into the meaning of misconduct or misfeasance in office, the causes stated in the constitution for which the state engineer may be removed. The thought would naturally occur, it seems to us, that those words have reference to some official misconduct or misfeasance, rather than personal, misbehavior alone not in any way affecting the incumbent's fitness or capacity to perform the duties of the office. And so the courts have held. It is said in Mechem on Public officers (Sec. 475):

"Where the removal is to be for *official* misconduct or for misfeasance or maladministration *in office,* the misconduct which shall warrant a removal of the officer must be such as affects his performance of his duties as an officer, and not such only as affects his character as a private individual. In such case, it is necessary 'to separate the character of the man from the character of the officer.' Misconduct, willful maladministration or breach of good behavior, in office, do not necessarily imply corruption or criminal intention. The official doing of a wrongful act, or the official neglect to do an act which ought to have been done, will constitute the offence, although there was no corrupt or malicious motive."

The same principle is stated in Throop, at Section 367:

"Where the constitution or a statute authorizes a removal for official misconduct, or misfeasance, misconduct, or maladministration in office, or similar acts of misbehavior in office, the general rule is, that the officer can be removed only for acts or omissions relating to the performance of his official duties, not for those which affect his general moral character, or his conduct as a man of business, apart from his conduct as an officer."

In Board v. Williams, 96 Md. 232, 53 Atl. 923, the court say:

"The phrase 'for cause' does not mean the arbitrary will of the appointing power, for that might be the outgrowth of mere whim, caprice, prejudice or passion, which would, in reality, be no cause at all. But the phrase 'for cause' must mean some cause affecting or concerning the ability or fitness of the incumbent to perform the duty imposed upon him. * * * Hence it must be inefficiency, incompetency, or other kindred disqualification. * * * When the right to remove can be exercised only for specific cause, or for cause generally, the appointing power cannot arbitrarily remove the officer."

To the same effect: 29 Cyc. 1410; 22 R. C. L. 571; State v. Board, 45 Mont. 188, 122 Pac. 569; Townsend v. Council, 71 Minn. 379; 74 N. W. 150; Moulton v. Scully, 111 Me. 428, 89 Atl. 944; Jones v. State, 104 Ark. 261, 149 S. W. 56; Ann. Cas. 1914C 302; State v. Slover, 113 Mo. 202, 20 S. W. 789; State ex rel v. Hawkins, 44 O. St. 98; 5 N. E. 228; State v. McGarry, 21 Wis. 496. And "cause" prescribed as ground for the removal of an officer means "legal cause," so that the power cannot be exercised whimsically or arbitrarily. People v. Lord, 9 Mich. 227; Dullam v. Wilson, 53 Mich. 392; 19 N. W. 112, 51 Am. Rep. 128; Hagarty v. Shedd, 75 N. H. 393, 74 Atl. 1055; Farish v. Young, 18 Ariz. 298, 158 Pac. 845; The Judges' cases, 102 Tenn. 509, 521; 53 S. W. 134; State v. Hay, 45 Neb. 321; 63 N. W. 831; State v. Frazier, 47 N. D. 314, 182 N. W. 545; Lancaster v. Hill, 136 Ga. 405, 71 S. E. 731, Ann. Cas. 1912 C. 272. In the case last cited, the court say:

"Sufficient cause means legal cause, and that which especially relates to and affects the administration of the office, and must be restricted to something of a substantial nature directly affecting the rights and interests of the public. * * * We do not think that the words 'sufficient

cause' could be construed to embrace any cause not affecting the competency of the officer and his official conduct.''

In Jones v. State, supra, it is said that the general terms ''incompetency,'' ''malfeasance,'' ''misfeasance'' a n d ''nonfeasance'' have reference to official conduct.

Tested by the principles aforesaid, the conviction is forced upon the court that the removal of the relator cannot be sustained as for a cause specified in the constitution, or in the statute so far as applicable to the office in question. Further than that we need not decide. We think it very clear that the charge specified in the filed statement of the reasons for the removal did not involve any act or omission that could properly be held to amount to misconduct or misfeasance in office. The relator is charged in that statement, and also in the statement directed and sent to him, with having allowed his commission as State Engineer to be presented to the senate for confirmation without the governor's knowledge or consent. That is all. The statement that in doing it, the relator had participated in and attempted a usurpation of the function of the governor is merely an interpretation of the effect of the act charged. We are quite unable, however, to agree with that interpretation. The senate proceedings above quoted do not indicate that the relator assumed or pretended to represent or to exercise any power or prerogative of the governor or the governor's office. They clearly show, we think, the fact, or at least a recognition of the fact, that the senate was not acting upon any communication or request from the governor; and this appears more clearly comparing those proceedings with the proceedings confirming the other Governor Carey appointments communicated to them by Governor Ross. The senate certainly understood that it was not acting pursuant to executive request when adopting the resolution or motion confirming relator's appointment, but that it was acting in the absence of such request.

Nor do we think the act charged amounted to insubordination, if it might be conceded that lack of obedience to the authority of the governor in a matter not pertaining to the discharge of the duties of the Engineer's office would constitute misconduct or malfeasance in office, within the meaning of those terms as used in the constitution when prescribing causes for removal. The Senate is a coordinate branch of the appointing power as to said office; and we think it cannot be held an offense or official misconduct for an officer to confer with members of the Senate about confirming an appointment of himself already made or anticipated, or to inform them of the fact that he has been appointed.

The absence of any authorized cause for removal in the charge that the relator participated in and allowed his commission to be presented to the senate for confirmation without consulting the Governor, or the implied charge that he may have requested such confirmation, becomes the more apparent when we consider what, if any, harm was caused the executive office by that act. If the confirmation under those circumstances might be held ineffectual, the only result would be to continue the relator in office under his vacancy appointment, which he would remain entitled to hold after the adjournment of said legislative session and during the recess of the senate, unless removed according to law, or a vacancy should occur by some event other than the mere expiration of the term. For the governor had not sent the name of any person for this office to the senate during that session. And the effect of the situation was no different, assuming, as we have held, that the confirmation was effective, except that he would then be holding the office under his later appointment as confirmed. In either event, a vacancy not occuring otherwise, the relator's removal would be necessary to authorize the appointment of a successor.

If, as we have felt necessary to hold, the senate might properly act as it did in confirming the relator's appoint-

ment, then surely, as a corollary of that principle, the relator could not properly be held guilty of misconduct or misfeasance in office, because of the fact that he had allowed the senate so to act or had participated in or allowed his commission to be presented to the senate for that purpose. The truth is, that after much reading and consideration of the reasons stated for the removal, the court is unable to extract therefrom anything more than that by relator's act aforesaid, he incurred the displeasure of the governor, who considered that act a personal affront. But to hold that to be a sufficient ground for removal would be tantamount to a declaration that the governor, arbitrarily, through mere whim or caprice, or personal dislike or displeasure, may remove any appointive officer subject to removal by him under the constitution or the statute aforesaid. And it is very clear that the court would not be justified in going to that extent, at least as to the office in question which is only partially controlled by the statute, as above explained.

As a result of the views hereinbefore announced, the respondent's answer must be held insufficient and his demurrer to the reply overruled; and unless further facts are to be pleaded an order will be entered declaring the relator entitled to the office and directing the appropriate relief.

Blume and Kimball, JJ., concur.

NOTE—See 12 C. J. pp. 712, 715; 23 C. J., pp. 90, 97,, 102, 120; 29 Cyc 1410; 31 Cyc 338, 341; 32 Cyc 1460, 1456; 36 Cyc 858, 860, 861.